**UNITED STATES of America**

v.

**Richard BOTTINI.**

**No. Civ. A. 95–1716.**

United States District Court,
W.D. Louisiana,
Lake Charles Division.

Feb. 12, 1997.

Sabrina Skeldon, U.S. Atty's Office, Shreveport, LA, for U.S.

John K Anderson, Tillman & Anderson, Leesville, LA, for Defendant.

## AMENDED OPINION

TRIMBLE, District Judge.

The court's opinion of February 5, 1997 is amended to read as follows:

This is a suit brought by the United States of America for civil penalties under the False Claims Act, 31 U.S.C. § 3729, et seq. Because the United States has commenced this action under a federal law, this court has original jurisdiction by virtue of 28 U.S.C. § 1331 and § 1345.

Plaintiff's claims against Richard Bottini are predicated upon contentions that Bottini, on three separate occasions, has presented false or fraudulent claims for payment of worker's compensation benefits under the Federal Employees Compensation Act (FECA). At all times pertinent hereto, defendant was employed as a medical clerk by the Department of the Army at Fort Polk in the Western District of Louisiana. Plaintiff seeks a civil penalty in the amount of $10,000 on each of the three allegedly fraudulent claims, or a total of $30,000, together with court costs. Defendant contends that he sustained legitimate injuries on three separate dates, for which he is entitled to receive benefits under the FECA.

### Summary of the Evidence

The defendant, Richard Bottini, has been employed as a clerical assistant at Bayne–Jones Army Community Hospital (B–JACH) since 1982. He testified that he is familiar with regulations regarding the admission and discharge of patients. In 1991, he filed a claim for worker's compensation benefits and knows that said benefits are for injuries to federal employees which occur on the job.

He further is aware that civilian employees are not entitled to elective surgery in military hospitals.

Mr. Bottini further testified that he knows that the CA–1 form is used in making claims for traumatic injury which has occurred in the course and scope of employment.

Mr. Bottini testified that at about 10:30 a.m. on March 22, 1993, while lifting a box of forms, he experienced abdominal pain. He claims that he reported this incident to his acting supervisor, Beverly Thaxton. He testified that he told her he had felt a pulling and stretching in the abdomen and did not know whether to work or not. He did, however, remain at work the rest of the day. He also claims that he told a surgeon, Dr. Ruggieri, what had happened on that date. When he reported to work at 7:00 a.m. the following day, March 23, 1993, he was suffering with severe pain in his abdomen which worsened to the point that he reported his condition to Dr. Ruggieri, who admitted him to the operating room and performed surgery for an incarcerated abdominal hernia. He remained at B–JACH until March 27, 1993.

He suffered some complications with the surgery, and was admitted to Byrd Memorial Hospital on March 30, 1993, where he remained until April 6 or 7. He testified that on April 28, 1993, he obtained the CA–1 form and filled it out, claiming an injury on March 22, 1993, while at work and seeking worker's compensation benefits in consequence thereof.

Mr. Bottini testified that he went back to work in September or October of 1993, but he was still in pain. He testified that on January 11, 1994, he tripped over a shelf and hit his abdomen on the desk, causing additional injury. He went to the emergency room and reported the accident to his supervisor, Mary Brown. This accident, he says, was witnessed by Cheryl Clause. It is noted that Cheryl Clause did not testify, but on the CA–1 form submitted on January 11, 1994, Ms. Clause stated, "I heard a loud crashing noise and heard someone yell. Richard then walked into my office limping and said he hurt himself."

Defendant testified about the examinations and/or treatment of some nine physicians following this alleged accident. On May 2, 1994, the defendant accepted the offer to return to work at his former position with certain restrictions as to activities and limited to five hours per day. Mr. Bottini admitted that he had never reported to his physician that his condition had improved, but he testified that at some point in time, he did not remember when or where, he told Dr. Vinh that he was playing golf.

Mr. Bottini filed a third claim for compensation benefits on December 14, 1994, based on an on-the-job injury which he testified occurred on March 3, 1993. He stated that in this incident, he also had abdominal pain when he picked up a box of forms, and that he reported this to his supervisor, Captain Gonzales. He told her that he was not injured that badly and could continue work, which he did. He also worked the following day. He testified he was in too much pain to work on March 5 and claims that on March 9, he told Dr. Ruggieri that he injured himself while lifting a box. He saw Dr. Ruggieri at B–JACH. Ruggieri ordered a barium enema, which was performed at Byrd Hospital. He remained at work until the lifting incident on March 22, 1993, and his surgery on March 23, 1993. He testified that he had filed a claim for the March 3, 1993 injury because of things which were brought out during the administrative hearing regarding his prior claim. During the time that these claims were being prosecuted, Mr. Bottini testified that he did perform bookkeeping services for his wife's business, making complete entries and depositing her checks.

Betty Gosewehr is a general accounting clerk at B–JACH. She is a medical services accounts officer for the hospital. She has worked there for over 12 years. She testified that civilians can be treated at the hospital for injuries occurring on the job. The injury must be reported to the supervisor, who would initiate a CA–1 form. The safety officer would be notified as well as the civilian personnel officer, who would provide appropriate forms. There was no claims for injury paperwork filled out on Mr. Bottini prior to March 23, 1993. He was admitted

directly from the ward to surgery. There was no indication of any worker's compensation claim in any of the paperwork pertaining to admitting. Claims were submitted to Blue Cross for the surgery, as Blue Cross was defendant's personal hospitalization insurer, and she understood that it was not an on-the-job injury. Blue Cross would not pay benefits for hospitalization and/or treatment resulting from injuries on the job. Bottini executed an assignment of benefits from Blue Cross to B–JACH. The cover sheet for the admission shows that it was for a disease, not an injury. If an accident had been involved, the admissions clerk would have entered how, when, and where the injury occurred on the cover sheet. There is no such entry in this case. While he was in the hospital, between March 23 and March 27, 1993, Bottini told her that he had been injured on the job. Margaret Castaneda is the research manager at B–JACH. She recalled an incident in 1991 when Bottini spoke with her about filing a CA–1 form for worker's compensation benefits after injuring his leg while playing basketball at the Fort Polk Fitness Center. She recalls questioning whether this was an on-the-job injury, since he was playing basketball. Defendant cited her the regulation that gave him the right to file for worker's compensation benefits.

Dr. Roger Downs is an oral surgeon who served at Fort Polk from 1986 until 1989 and from 1991 until 1994. He worked in the dental clinic while Bottini worked on the surgical ward. He testified that he saw the defendant every day that he was at work in March of 1993. He noticed that Bottini was having abdominal pains on a daily basis, and they seemed to get worse. Before March 23, 1993, the day of surgery, he noted that Bottini was doubled over, in extreme pain, and on the verge of collapsing. He complained of severe abdominal pain. Over objection, the court permitted Dr. Downs to testify that Bottini told him that he had lifted several boxes of *charts* on the ward, which caused him extreme pain. This last testimony was permitted solely for the purpose of establishing notice, if notice is a factor in this case, but not for the truth of the etiology of the defendant's symptoms. Dr. Downs did not elicit this self-serving statement from Bottini

for the purpose of medical diagnosis or treatment, and consequently it would constitute hearsay if offered to prove the truth of the assertion that defendant injured himself while lifting boxes. The court further notes that in a "To Whom It May Concern" statement, dated July 22, 1993, Dr. Downs stated in pertinent part:

"I had observed Mr. Bottini being in obvious pain in his left abdomen for over two weeks prior to his emergency surgery date. When I asked Mr. Bottini what caused this pain, he stated it started after he lifted boxes of *forms* on the ward. \*\*\*"

Stan Salter is the safety manager at B–JACH. He testified that all employees at the hospital are required to attend safety briefings. He recalled Mr. Bottini's basketball injury in 1991, and he filled out part of the CA–1 form at that time. He could not be 100 percent certain if the defendant was apprised of the reporting requirements for on-the-job injuries. It would have been his job to investigate an injury occurring on the job at the hospital, including such an injury as Mr. Bottini claims occurred to his abdomen in this case. He learned about Mr. Bottini's surgery when the defendant was already admitted and was either undergoing or had undergone the operative procedure. He did not investigate, because he was not notified of any "incident." He spoke to personnel on the ward to determine if an accident had occurred, and he found no information that would lead him to believe that there was an on-the-job injury. He first heard of the worker's compensation claim being filed on April 28, 1993.

Beverly Thaxton is a registered nurse working on the ward at B–JACH. She performed a "nursing history and assessment," which appears in the medical records at the hospital, from information obtained from the defendant. This is dated March 23, 1993, at 10:55. She noted that the defendant was ambulatory and cooperative at the time. On the form she made a note which reads as follows:

"Onset of abd pain x2–3 wks ago. Progressively worse. Severe pain this AM p arrival to work. Seen by Dr. Ruggieri."

Ms. Thaxton testified that defendant did not tell her about any lifting accident. She had seen him on the ward for the previous two to three weeks, and on March 22, 1993, she was the acting supervisor in the absence of Captain Gonzales. Mr. Bottini did not request that she fill out a CA–1 form at any time prior to his surgery, and Dr. Ruggieri never told her anything about an on-the-job injury sustained by Bottini. She recalled that Castaneda and Salter were told that Bottini was admitted for surgery at B–JACH as a civilian emergency.

Ms. Thaxton testified that on April 28, 1993, defendant brought her a CA–1 form which he needed her to sign. She signed the form, but she denied that she had prior to that date (4/28/93) heard anything about an alleged work-related injury sustained by Bottini. Under cross-examination, she again flatly denied that Bottini told her about any injury that he sustained while picking up a box of forms on March 22, 1993, as the CA–1 form represented. She saw the defendant on the ward on the morning of March 23, 1993, before his admission to the hospital. Dr. Ruggieri said that he would take care of getting him admitted as a civilian emergency. Prior to the admission, Bottini had complained of pain in his side and would hold his side, but he never told her about any injury on the job of any type before his surgery.

Celina Mann is the business office manager at Byrd Memorial Hospital in Leesville. She identified the emergency room outpatient record of Bottini for March 16, 1993. She explained that there is a place on the form to check whether the patient has sustained an employment related injury, and if so the date, time, and place of injury. There was no such information on the form for March 16, 1993. She further reviewed the admission record for defendant's admission to Byrd Hospital on March 30, 1993, and again there was no information about any job-related injury. Benefits were assigned from Blue Cross, Bottini's insurer, which would not have been done if the injury had occurred on the job.

Efrain Santiego is a claims supervisor for the Department of Labor, Division of Workers Compensation. He testified concerning the use of the CA–1 form and explained the reasons for the rejection of all three of defendant's claims which are the subject of this lawsuit. He testified about the requirement under the Code of Federal Regulations [20 C.F.R. § 10.124(a)], that an employee report changes in his condition affecting his ability to work to his physician. Based on his review of the surveillance films showing Mr. Bottini playing golf in May and June of 1994, Mr. Santiego testified that defendant should have reported a change in his physical condition to his physician.

Dr. George Miller is a surgeon at B–JACH, and in fact is the chief of surgery. He is a board certified general surgeon and knows the defendant. He has reviewed the medical records concerning the defendant, and he feels that it is improbable that Bottini suffered a work-related injury which caused the condition for which surgery was performed on March 23, 1993. The location of the hernia is inconsistent with a lifting injury, and based upon his training and experience, it is more likely that it is related to a preexisting condition. He reviewed the videotape of Bottini playing golf, and it was his opinion that he was fully able to return to his clerical duties for eight hours per day at that time.

Brigadier General Betty Simmons was chief of the nursing department at B–JACH in 1993. She was present in the hospital on March 23, 1993, when defendant was admitted for surgery. He was in the operating room when she found out about his being there. She had no prior notice of it. Before his admission, she had talked to Bottini about his abdominal pain, and she knew that he had seen some of the doctors there in the hospital informally for medical advice. Bottini was told that nothing could be done for him at B–JACH unless there was a *bona fide* emergency. Bottini never told her that he had injured himself lifting a box of forms. She was not aware until April 28, 1993, of any claim by Bottini that he had sustained an on-the-job injury. Bottini had worked all day on March 22, 1993, the day before his surgery.

The court viewed the tapes of Mr. Bottini playing golf at the Leesville Municipal Golf Course in May and June of 1993, and the

court verifies that the account of investigator Charles C. Cramer, Jr. (D–25) is an accurate summary of defendant's activities on the golf course. The tapes and testimony of the defendant established that he was, in fact, during May and June of 1993, working at B–JACH until noon, then leaving because of his supposed disability, traveling to his wife's place of business, and thence to the golf course, where he would play several hours of golf two to three times per week. His movements, as reflected in the videotape, show no indication of any disability whatsoever, and this court does not need the interpretation of Dr. Miller, Dr. Vinh, or anyone else to discern that Mr. Bottini was fully capable of remaining at his station performing clerical duties at the hospital for the full eight hours if he could engage in the vigorous golfing activities that he displayed.

There were depositions of several doctors. These will not be summarized, but their testimony will be alluded to as necessary in the court's analysis of this case.

The defense called, in addition to defendant, Mrs. Yamilet Bottini, defendant's wife. She and the defendant have been married since 1984 and are the parents of two sons. She recalls receiving a telephone call from the defendant at about 10:30 a.m. on the day of surgery. He had been complaining of pain in his abdomen for two to three weeks before the operation. The pain had intensified the day before surgery. Mr. Bottini had been released from B–JACH three or four days after his surgery, and went home with continued complaints of pain in the lower abdomen. She took him back to B–JACH, where he saw Dr. Ruggieri and received a prescription. Because of continued pain, she took him to the emergency room at Byrd Hospital in Leesville, where he saw Dr. Vinh. Dr. Vinh performed additional surgery, and defendant was in the hospital for about a week. Upon his return home, he continued in substantial pain. When the pain had subsided enough to permit, she took her husband to Fort Polk to fill out worker's compensation claims forms. She recalls that her husband went back to work sometime in 1993, then he was off work again for a period of time after 1993. She did not remember the dates.

## Law and Analysis

Under 31 U.S.C. § 3729, the False Claims Act, anyone who knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the armed forces of the United States a false or fraudulent claim for payment or approval is liable to the United States Government for a civil penalty of not less than $5,000.00 and not more than $10,000, plus costs. "Knowingly", according to the statute, means that a person has actual knowledge of the information, acts in deliberate ignorance of the truth or falsity of the information, or acts in reckless disregard of the truth or falsity of the information, and there is no necessity to prove specific intent to defraud.

■ The government need not prove that the false claim caused damages or the amount of any such damages in order to recover the civil penalty. *United States v. Miller,* 645 F.2d 473 (5th Cir.1981); *United States, ex. rel. Marcus v. Hess,* 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943); *Rex Trailer Co. v. United States,* 350 U.S. 148, 76 S.Ct. 219, 100 L.Ed. 149 (1956).

### The Claim for Federal Employees Compensation Act (FECA) Benefits Filed on the CA–1 Form on April 28, 1993

■ On this form, defendant sought to recover disability benefits for an alleged on-the-job injury sustained on March 22, 1993. He claims that this injury occurred when he lifted a box of forms in connection with his clerical work. He further claims that he reported this to his supervisor, Beverly Thaxton. Beverly Thaxton denies that he reported any such incident.

Defendant is corroborated in his assertion that he was injured when lifting a box of forms on March 22, 1993, by only one person. Dr. Paul Ruggieri, who performed the operation for an "incarcerated abdominal hernia" on March 23, 1993, prepared and signed letters in which he mentions such an incident. In his letter of July 30, 1997, Dr. Ruggieri says "At one point prior to his surgery, Mr. Bottini expressed to me that his pain had worsened suddenly after picking up a box at

work." On January 4, 1994, Dr. Ruggieri stated "The day prior to his surgery (March 22, 1993), Mr. Bottini expressed to me that his abdominal pain acutely worsened after lifting a box on the ward at work." .

On June 10, 1994, Dr. Ruggieri signed a letter with the same statement that appeared in his July 30, 1993 letter.

On deposition, under cross-examination, the doctor admitted that the first time he heard about the lifting incident was at about the same time he wrote his first letter on July 30, 1993. Further, it is apparent from the report of the investigation into the defendant's admission to the military hospital for surgery, dated April 19, 1993, that no such lifting incident had been reported to Dr. Ruggieri prior to his surgery. The investigating officer asked Dr. Ruggieri if he was aware before operating on Bottini that he was not entitled to medical care at B–JACH except in emergencies and on-the-job injuries. Dr. Ruggieri responded that he did know that. He further testified that the only reason that he operated on Bottini at B–JACH was that he had an incarcerated hernia which required immediate surgical attention. Not one word, in his description of his presurgical examinations and treatment of Bottini, was said by Dr. Ruggieri about any lifting incident.

The court totally rejects any and all accounts by Dr. Ruggieri that Bottini told him, prior to surgery, about any lifting incident. It is apparent to the court that Dr. Ruggieri was called upon by Mr. Bottini for some assistance in his claim for disability benefits sometime following the surgery, and he was willing to try to help Bottini in his quest. Based upon the cross-examination in his deposition and a comparison with his testimony reported during the investigation, this court finds that the doctor's statements about his knowledge of a lifting incident prior to the surgery are totally unreliable.

On the traumatic injury issue, the medical records regarding the defendant prior to surgery are enlightening. A radiologic report dated March 12, 1993, reflects that abdominal X-rays of Bottini were done three days earlier, and the reason for the requested X-rays was stated to be abdominal pain for one week. No mention was made of any injury, lifting or otherwise. On March 16, 1993, the outpatient record at Byrd Hospital shows that Dr. Ghanta saw the defendant on that date and had a barium enema performed, which was normal. The purpose was to rule out colitis. The doctor's note of March 16, 1993, reflects that Bottini had had complaints of discomfort in the left side for two to three weeks as well as nausea and alternating diarrhea, then constipation. The doctor recorded no history of injury, and on the emergency room outpatient record, there is no indication that there was an employment related injury and no information concerning date, time, or place of any injury. Further, when defendant saw Dr. Ghanta again on April 12, 1993, again there was no mention of any injury. Mention has already been made of the nurse's history obtained from Bottini by Beverly Thaxton on March 23, 1993, prior to admission to B–JACH, again with no mention of any injury. The discharge summary reflects the following history:

"The patient is a 39 year old white male with a 2–3 week history of initially intermittent left mid-abdominal pain which has worsened over the last week. The patient states that the pain has been constant and worsening in intensity. He states that he has also noticed a bulge in his left upper quadrant. He also has the complaint of nausea and diarrhea. The nausea and diarrhea complaints have been over the last several days. He also states that his appetite has decreased and complains of the pain being worse, particularly with movement and is improved somewhat in the supine position. He denies any vomiting or blood in his stool."

Persuasive also is the testimony of Dr. Miller, the chief of surgery at B–JACH. As stated earlier, Dr. Miller, who was a very credible witness, felt that the location of defendant's hernia was inconsistent with any lifting injury. He also noted that the complete blood count obtained by Dr. Ruggieri on March 5, 1993, the abdominal X-ray of March 9, 1993, and the barium enema on March 16, 1993, were not diagnostic tests for detecting a hernia.

It is apparent that defendant fully understood the procedure for filing a worker's compensation claim. He had been through the same procedure in 1991, when he demonstrated to Ms. Castaneda that he was quite conversant with his FECA rights. It is also noted that Mr. Bottini executed assignment of benefits to the hospitals under his Blue Cross policy. The court cannot find clearly from the evidence that Mr. Bottini knew that benefits were not payable under the Blue Cross policy for job-related injuries, but it is difficult for this court to believe that someone had worked as a medical clerk for as many years as the defendant would not be aware of that fact. As stated, however, there is no clear evidence to that effect and the court will not hold him to that knowledge. It is not necessary to the decision in this case that such knowledge be established. It is sufficient, in the court's view, that Mr. Bottini had promptly filed a claim when he injured his ankle in 1991. The testimony in this case about his delay in filing the CA-1 form with regard to his alleged abdominal injuries because he felt he was not injured too badly is completely belied by the testimony of Ruggieri, Simmons, Thaxton, and Downs, all of whom noted that he appeared to be in severe distress for two or three weeks prior to his surgery. If he had indeed injured himself as he claims, on either March 3 or 22, 1993, it is inconceivable that Mr. Bottini would not have taken the same steps that he took in 1991 to present his claim for compensation.

Although the findings are not binding upon this court, the court notes the administrative hearing officers in all of the FECA claims have determined that no injury occurred as asserted by Mr. Bottini in any of his claims.

Based upon the foregoing, this court finds that there was no basis in fact for defendant's claim presented on April 28, 1993, that defendant knew there was no such basis at the time the claim was presented, and that he is therefore subject to the statutory penalties provided by the Act.

### The Claim for FECA Benefits Filed on the CA-1 Form on January 11, 1993

Defendant claims to have been injured on January 11, 1993, when he tripped over a shelf near his desk as he was walking toward his desk to pick up some forms. This, he claims, caused injury to his abdomen on the left side. This, of course, is the same side involved in the March 1993 surgery. It is noted that forms seem to play a prominent part in Mr. Bottini's mishaps. It is rather peculiar that he has worked at this hospital since 1982, and undoubtedly as a clerical assistant dealt with numerous forms on a daily basis. According to him, however, beginning in March of 1993, forms became his nemesis.

As mentioned earlier, Cheryl Clause signed a statement on the CA-1 form on January 11, 1994, to the effect that she heard a loud crashing noise and heard someone yell. Then Bottini walked into her office limping and told her he had hurt himself. She did not claim to have witnessed any accident, and she did not testify.

Following this alleged incident, the defendant, Bottini, on January 11, 1994, consulted Dr. George Riley, a physician at B–JACH. Dr. Riley simply assigned him to quarters for 24 hours, or until the following day. The next day, he saw Dr. Galfo at B–JACH, who referred him to surgery and again to quarters for 24 hours. Dr. Paul Ruggieri, the physician who performed surgery on March 29, 1993, examined Bottini on January 18, 1994, and on that date stated "Mr. Bottini can return to his regular work, as he was doing prior to this accident."

The defendant, not pleased with being told he could return to work, consulted Dr. Chanh Vinh, a general practitioner in Leesville, also on January 18, 1994. Dr. Vinh recommended that he not return to work until obtaining the results of a CT scan of the abdomen.

Following this, Mr. Bottini saw a series of doctors in Leesville and Shreveport. The reports from these physicians are equivocal at best and contradictory in some respects at worst. It suffices to say that the doctors were unable to find an objective anatomical basis for his complaints of pain. In May of 1994, while he was still complaining of pain to his physicians, Mr. Bottini began his practice of working five days a week at B–JACH, performing all of the bookkeeping tasks for

his wife's business, and golfing two to three afternoons per week. The video tapes, as previously mentioned, are indicative of no disability whatsoever, and certainly nothing which would disable him from performing eight hours of clerical duty.

For Mr. Bottini to have continued with the subterfuge of disability as he did was reprehensible and inexcusable. The question for the court to decide, however, is whether or not it subjects him to the civil penalty of the statute. The court notes that the claim filed with the Department of Labor, Office of Workers Compensation Programs, resulted in the claim of Mr. Bottini for benefits beyond January 18, 1994, the date that his treating surgeon certified he was able to return to work, being rejected. The court is in full accord with the decision cutting off benefits as of January 18, 1994, based on the record in this case. Further, Mr. Bottini's conduct as reflected in the golfing records, his testimony, and the video tape, completely discredit him as a believable witness. This court has serious doubts that Mr. Bottini ever sustained any actual injury to his abdomen on January 11, 1994, in the first place. However, the government makes no such contention and there was noise emanating from his office according to an independent witness. This court will, therefore, determine simply whether Mr. Bottini's failure to comply with 20 CFR 10.124(a), requiring him to report changes in his condition affecting his ability to work at his position and resuming federal employment when he was able to do so converts what may have been originally a valid claim to a false claim under the False Claims Act. This court finds that clearly Mr. Bottini did not comply with the cited regulation. He was obviously able to return to full employment long before he was caught playing golf vigorously and could have resumed his full employment.

■ Counsel for the United States cites two cases in support of her position. They are *In the matter of Arguelio Pacheco and United States Postal Service, Post Office,* 1988 W.L. 212221 (E.C.A.B.) and *In the matter of Charlene Herrera and United States Postal Service, Post Office,* 44 E.C.A.B. 361 (Colo.1993) (1993 WL 796156) (E.C.A.B.). A

review of these cases clearly reveals that violation of the regulation in question is cause for discontinuance of benefits; however, neither of these cases involved the False Claims Act. This court has found no judicial interpretation of 31 U.S.C. § 3729 lending support to the government's theory that a claim which was valid at the time presented becomes fraudulent and within the purview of the statute where the claimant fails to comply with some regulation and by reason of such failure becomes ineligible to qualify for continuing benefits. This court finds that the statute does not purport to operate so broadly. The statute is penal in nature and must be strictly construed. If Congress had intended such an effect it should have been spelled out in clear and unequivocable language. No such language exists in the statute, and for this reason, and this reason alone, the claims of the plaintiff with regard to the CA–1 form completed and presented by the defendant on January 11, 1994, are rejected.

### The Claim for FECA Benefits File on the CA–1 Form on December 14, 1994

■ Mr. Bottini, having failed in two earlier attempts to recover substantial continuing disability benefits for a job-related accident, on December 14, 1994, filed a CA–1 form claiming he was injured on March 3, 1993. This was the first time that any such claim had been presented, and in his testimony, as an excuse therefor, he indicated that he was prompted to do so by the administrative hearing officer.

The court has previously commented on Mr. Bottini's knowledge of his rights to worker's compensation by virtue of his conduct with regard to the 1991 accident. It is incredible to the court that he would delay from March 3, 1993 until December 14, 1994, to file a claim if in fact such a disabling injury had been sustained by him on that date. Further, the court has outlined in some detail the medical evidence between March 3, 1993 and March 16, 1993. It is unbelievable to this court that no mention was made in any of the medical records regarding his history of complaints during this period that he had sustained any injury

if in fact any such injury was grounded in truth. Captain Gonzales, the supervisor to whom he claimed to have reported this accident, has been transferred from Fort Polk and did not testify; however, it is noted that defendant, though he was totally conversant with the CA–1 form, did not make any claim for injury. Even if it is to be believed that he did not feel that he was injured on March 3, 1993, his complaints to Dr. Ruggieri and to the other persons at the hospital who saw and spoke to him during this time, make it clear that he knew not later than March 5, 1993, that he was having substantial pain requiring him to seek medical attention and undergo a number of tests. Despite this, no claim was submitted and no history of any injury was furnished to any of the health care providers. This court, on the basis of the medical reports prior to the surgery on March 23, 1993, on the failure to submit a claim when he was fully aware of his rights, and on his conduct as reflected in Bottini's testimony and the video tapes, finds that the defendant did not in fact sustain any injury whatsoever as alleged in the CA–1 form on December 14, 1994. The court further finds that this claim was known to Mr. Bottini to be false and fraudulent, and he is therefore subject to a civil penalty under the statute.

### Amount of the Civil Penalty

 The court has the discretion to assess a civil penalty as to each of the two claims found to be false and fraudulent at an amount between $5,000.00 and $10,000.00. Mr. Bottini is a clerical assistant at the military hospital. His wife operates a beauty shop. They have two sons. Though the defendant is not wealthy, Mr. Bottini's conduct was most opprobrious, and the court finds that a civil penalty on each of the fraudulent claims should properly be assessed in the amount of $7,500.00, or a total of $15,000.00, with interest.

### Findings of Fact and Conclusions of Law

In accordance with the foregoing, the court makes the following findings of fact:

1. At all times pertinent hereto, Richard Bottini was employed as a clerical assistant at B–JACH on Fort Polk, Louisiana, and had been so employed since 1982.

2. In 1991, Mr. Bottini had filed a claim for worker's compensation benefits under FECA, and he was fully aware of his rights at that time and thereafter to claim disability benefits for a personal injury occurring on the job.

3. Mr. Bottini, on April 28, 1993, submitted on a CA–1 form a claim for FECA benefits predicated upon an alleged injury to his abdomen from lifting a box of forms on March 22, 1993, while at work.

4. On March 23, 1993, Mr. Bottini was admitted to B–JACH for emergency abdominal surgery to correct an incarcerated abdominal hernia by Dr. Paul Ruggieri. Dr. Ruggieri admitted Bottini as an emergency case and not as a case involving a work-related injury, though he knew that these were the two bases for admitting civilian employees to military hospitals.

5. No claim was made upon admission to the hospital that there had been a work-related injury and the patient history, though it was quite detailed, reflected no such injury.

6. The medical records beginning March 5, 1993, reflect a number of tests and doctors' notes regarding complaints, but no mention whatsoever of any injury. These records chronicle the onset of abdominal pain in late February or early March, continuing and worsening with time.

7. Bottini did not report any injury to his supervisor or to anyone else on March 22, 1993, but completed a full day's work.

The abdominal wall hernia for which surgery was performed was not the result of any lifting injury as claimed, but was the result of preexisting conditions.

8. Bottini sustained no on-the-job injury on March 22, 1993, as claimed, and he knew at the time the claim was submitted that he had not sustained such an injury.

9. On January 11, 1994, Bottini submitted a CA–1 form claiming that he had tripped over a shelf, causing injury to his left abdomen area.

Though the accident was not witnessed, an employee in an adjoining office heard a noise,

and shortly thereafter Bottini came in and claimed to have hurt himself as described in the form.

10. The injury, assuming it occurred, was not serious, and Bottini was fully capable of returning to his prior employment as a clerk at B–JACH on January 18, 1994, when his treating surgeon, Dr. Ruggieri, indicated he could so return.

11. Despite his ability to return to work, Bottini continued to complain of pain in the abdomen and to seek medical assistance from physicians in Leesville and Shreveport, Louisiana. The physicians found no objective basis for his continuing complaints.

12. In May and June of 1994, at a time when Bottini was continuing to periodically visit a Dr. Vinh, and when he was working only five hours per day on the pretext that he was incapable of working longer hours, he was in fact leaving work at about noon, going to his wife's place of business, and then, two or three days per week, vigorously playing golf for three or four hours with no indication of physical disability or restriction.

13. Bottini did not return to work full time, though he was fully capable of doing so, until May 1993, and he therefore violated 20 C.F.R. § 10.124.

14. The plaintiff does not assert herein that defendant was not entitled to initial benefits for an on-the-job injury on January 11, 1994.

15. On December 14, 1994, two prior claims having been administratively rejected, Bottini filed a third claim on a CA–1 form in which he averred that he sustained an accidental injury on March 3, 1993, when lifting a box of forms.

16. In accordance with the discussion hereinabove, the medical and other evidence in this case unequivocally refutes the occurrence of an injury as asserted on March 3, 1993, and this claim, as the first one, was made with full knowledge that it had no basis in fact.

On the foregoing findings of fact, the court makes the following conclusions of law:

1. The United States of America, plaintiff herein, has established by a preponderance of the evidence that defendant, Richard Bottini, on April 28, 1993 and on December 14, 1994, presented fraudulent and false claims subjecting him to liability for civil penalties pursuant to 31 U.S.C. § 3729.

2. While defendant Bottini violated the provisions of 20 C.F.R. § 10.124(a) by not returning to full employment at a time when he was fully capable of doing so, 31 U.S.C. § 3729 does not encompass a claim which was valid when presented where entitlement to additional benefits ceased because of a violation of pertinent regulations.

3. The plaintiff is entitled to recover against the defendant the sum of $7,500.00 on the false claim submitted on April 28, 1993, and a like amount for the false claim submitted on December 14, 1994, or a total of $15,000.00, together with legal interest from date of judgment until paid in full, and all costs of these proceedings.

Judgment will be entered in accordance with the above findings of fact and conclusions of law.