**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 10 2003**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA, ex rel.
MARY L. HOLMES,

        Plaintiff - Appellant,

and

UNITED STATES OF AMERICA,

        Movant-Appellee,

        No. 01-1077

v.

CONSUMER INSURANCE GROUP;
JOHN R. HIGHTOWER,

        Defendants.

**ON REHEARING EN BANC**
**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. No. 99-D-665)**

Craig D. Joyce, Walters & Joyce, P.C., Denver, Colorado, for the Plaintiff-Appellant.

Charles W. Scarborough, Appellate Staff Civil Division, Department of Justice, (Robert D. McCallum, Jr., Assistant Attorney General; John W. Suthers, United States Attorney; Douglas N. Letter, Appellate Staff Civil Division, Department of Justice with him on the brief) Washington, D.C., for the Movant-Appellee.

Before **TACHA**, Chief Judge, **SEYMOUR**, **EBEL**, **KELLY**, **HENRY**, **BRISCOE**, **MURPHY**, **LUCERO**, **HARTZ**, and **O'BRIEN**, Circuit Judges.

---

**BRISCOE**, Circuit Judge.

---

Relator Mary L. Holmes appeals the district court's dismissal, for lack of subject matter jurisdiction, of her claims under the False Claims Act (FCA), 31 U.S.C. §§ 3729-33. A divided panel of this court affirmed the district court's judgment. See United States ex rel. Holmes v. Consumer Ins. Group, 279 F.3d 1245 (10th Cir. 2002). This court subsequently granted rehearing en banc. Upon rehearing, we vacate our prior opinion in this case, reverse the judgment of the district court, and remand for further proceedings.

I.

Since 1985, Holmes has served as the postmaster in Poncha Springs, Colorado. In October 1995, Cameron Benton and Henry Modrejewski, employees of defendant Consumer Insurance Group (CIG), inquired at the Poncha Springs post office about the cost of bulk mailing. After Holmes calculated the cost of CIG's intended mailing, Modrejewski told Holmes "that was not the rate they were being charged for the same type [of] mailing at the Howard, Colorado post office." App. at 101. More specifically, Holmes was informed that CIG was being charged "per pound," rather than "per piece," at the Howard post office. Id. at 10. The "per pound" rate, which is significantly lower than the "per piece" rate, applies if each individual piece of mail weighs in excess of

3.3062 ounces. Holmes called Jenny McKinnon, the Howard postmaster, who confirmed that CIG was receiving the "per pound" rate at the Howard post office. Assuming that McKinnon was correct, Holmes accepted CIG's bulk mailing at the "per pound" rate.

After further checking, Holmes concluded that her initial calculation was correct and that CIG's bulk mailing did not qualify for the "per pound" rate because each individual piece weighed only .3 ounces. Holmes informed Benton of her conclusion. Benton responded that CIG could not afford to use the "per piece" rate because it was "prohibitively expensive." Id. at 11. After speaking with Benton, Holmes contacted McKinnon at the Howard post office and informed her that CIG's bulk mailings did not, in fact, qualify for the "per pound" rate.

Nearly two years later, in August 1997, Holmes was training an acting postmaster, Al Ferguson, at the Howard post office concerning how to "close out the books and make sure everything balanced for the year." Id. at 85. During a lunch break, Holmes asked Ferguson the rate CIG was being charged for bulk mailings. According to Holmes, she was curious whether McKinnon had corrected the bulk mail rates for CIG because CIG was trucking all of its mail to the Howard post office. Ferguson told Holmes that CIG was still being charged the "per pound" rate. Upon returning to the Howard post office, Holmes and Ferguson "did some calculations and determined that the CIG mailings were . . . being undercharged by about $200,000 per year." Id. at 86. Holmes also discovered that CIG had been falsely certifying that its bulk mailings weighed in excess of 3.3062

ounces per piece. Holmes reported her findings concerning CIG's bulk mailings to her manager, who oversaw both the Poncha Springs and Howard post offices.

In December 1997, after allegedly hearing nothing from postal inspectors, Holmes wrote to the Inspector General's Office in Washington, D.C., and reported the problem concerning CIG's bulk mailings. The Inspector General's Office responded by letter in March 1998, stating, in pertinent part, that Holmes' "information" had been "reviewed . . . and referred . . . to the appropriate Office of Inspector General Director for action deemed warranted," and that Holmes would "be contacted if additional details [we]re needed." Id. at 54. As Holmes was allegedly concerned that the Inspector General's Office would take no action, she also reported the problem to a postal systems coordinator.

In late March 1998, the Postal Inspection Service began an administrative investigation into Holmes' allegations regarding CIG's bulk mailings. On April 1, 1998, postal inspector James Hayson (the lead agent), accompanied by three other postal inspectors, a postal inspector general agent, and two revenue assurance analysts, spent a week at the Howard post office collecting and reviewing documents concerning CIG's mailings. "During the subsequent months," Hayson "located and interviewed at least ten individuals including current and former employees of [CIG] and current and former employees of the Postal Service." Id. In particular, Hayson interviewed Benton and Modrejewski, who no longer worked for CIG. Hayson also interviewed Jim Benbrook, a

current employee of CIG who acknowledged transporting many of the mailings at issue to the Howard post office. Benbrook initially denied knowledge of the alleged fraud, but evidence subsequently obtained by the government "suggests that [he] was an active participant in the fraud." Govt. Br. at 10. During all of the interviews, Hayson "disclosed the Government's suspicions that CIG had knowingly underpaid postage based on false mailing statements . . . and that John Hightower[, CIG's owner,] knew the mailing statements were false." App. at 35.

In July 1998, Hayson referred the case to the United States Attorney's Office for the District of Colorado, which began working on the case jointly with the Postal Inspection Service. In August 1998, the Postal Inspection Service served an administrative subpoena on CIG demanding production of documents and information related to the company's mailings, and CIG responded to the subpoena in November 1998. "From December 1998 through 1999, the U.S. Attorney's Office and the Postal Inspection Service continued jointly to build a case against CIG by analyzing the documents produced by CIG pursuant to the . . . [s]ubpoena." Id. at 36.

On April 2, 1999, Holmes filed this qui tam action under seal. The government intervened and moved to dismiss Holmes as a party for lack of subject matter jurisdiction pursuant to 31 U.S.C. § 3730(e)(4). The government asserted that (1) it had publicly disclosed information concerning the fraud allegations against CIG in the course of its administrative investigation (i.e., by interviewing Benbrook, Benton, and Modrejewski

-5-

and informing them about its suspicions); (2) Holmes' qui tam action was based upon those "publicly disclosed" allegations; and (3) Holmes did not qualify as an "original source" of the information contained in her complaint because she was obligated, as part of her job duties, to report fraud and procedural irregularities. The district court granted the government's motion to dismiss Holmes as a party and, at her request, entered judgment against her so that she could immediately appeal her dismissal from the case.

II.

Holmes contends that the district court erred in dismissing her from the case for lack of subject matter jurisdiction pursuant to 31 U.S.C. § 3730(e)(4). According to Holmes, § 3730(e)(4) does not bar her from proceeding as a relator because there had been no "public disclosure" of information at the time she filed the action, and, in any event, she qualifies as an "original source" of the information upon which her complaint was based.

Section 3730(e)(4) provides:

> (A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.
> (B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

31 U.S.C. § 3730(e)(4)(A), (B). "Satisfaction of the provisions of 31 U.S.C. § 3730(e)(4) is a question of subject matter jurisdiction." United States ex rel. Fine v. Advanced Sciences, Inc., 99 F.3d 1000, 1003 (10th Cir. 1996). Thus, issues involving the interpretation and application of § 3730(e)(4) are reviewed de novo. United States ex rel. Precision Co. v. Koch Indus., Inc., 971 F.2d 548, 551 (10th Cir. 1992). Because federal courts are courts of limited jurisdiction, "we presume no jurisdiction exists absent a showing of proof by the party asserting federal jurisdiction." Id. Therefore, Holmes, the party invoking federal jurisdiction, bears "the burden of alleging facts essential to show jurisdiction under the False Claims Act as well as supporting those allegations by competent proof." Fine, 99 F.3d at 1004.[1]

When, as here, a court's subject matter jurisdiction depends upon the same statute that creates the substantive claims, the jurisdictional inquiry is necessarily intertwined with the merits. Holt v. United States, 46 F.3d 1000, 1003 (10th Cir. 1995). More specifically, the jurisdictional question of whether a "public disclosure" has occurred arises out of the same statute that creates the cause of action. United States ex rel. Ramseyer v. Century Healthcare Corp., 90 F.3d 1514, 1518 (10th Cir. 1996). We have determined that these "intertwined" jurisdictional inquiries should be resolved under

---

[1] The dissent criticizes our discussion of and reliance on Fine. In our view, the rationale for our analysis of Fine is clear. In the proceedings in the district court, the government argued, and the district court agreed, there was a lack of subject matter jurisdiction pursuant to 31 U.S.C. § 3730(e)(4). Since Holmes, the appellant, contends the district court erred in its ruling, it is logical to first address that issue.

-7-

Federal Rule of Civil Procedure 12(b)(6) or, after proper conversion into a motion for summary judgment, under Rule 56. Id. The district court here purportedly resolved the government's motion to dismiss under Rule 12(b)(6). However, because the district court relied on affidavits and other evidence submitted by the parties, the motion should have been treated as a motion for summary judgment under Rule 56. We therefore proceed to review the motion as one for summary judgment.

Generally speaking, the jurisdictional inquiry under 31 U.S.C. § 3730(e)(4)(A) involves four questions: (1) whether the alleged "public disclosure" contains allegations or transactions from one of the listed sources; (2) whether the alleged disclosure has been made "public" within the meaning of the FCA; (3) whether the relator's complaint is "based upon" this "public disclosure"; and, if so, (4) whether the relator qualifies as an "original source" under § 3730(e)(4)(B). Fine, 99 F.3d at 1004. If the answer to any of the first three questions is "no," the jurisdictional inquiry ends and the qui tam action proceeds, regardless of whether the relator is an original source. The last inquiry, whether the relator is an original source, is necessary only if the answer to each of the first three questions is "yes," indicating the relator's complaint is based upon a specified public disclosure. Id.; see Precision, 971 F.2d at 552 & n. 2.

In concluding that it lacked subject matter jurisdiction over Holmes' qui tam claims, the district court acknowledged, but did not ultimately apply, the four-part inquiry. According to the district court, the four-part inquiry is applicable only "where

the government is not actively investigating the alleged wrongdoing." App. at 125. The district court concluded that the purpose of the four-part inquiry under such circumstances is to determine "whether the government is 'capable' of pursuing the suit itself." Id. The court further concluded that, in situations where the "government is actively pursuing the alleged wrongdoing when the qui tam action is sought," the four-part inquiry is unnecessary "because it is clear that the government has already identified the problem." Id. (internal quotation and citation omitted). Applying this unique analytical framework, the district court concluded that it lacked subject matter jurisdiction over Holmes' qui tam claims:

> In this case, it is undisputed that, prior to the filing of the qui tam complaint by Holmes, the OIG [Office of Inspector General] and PIS [Postal Inspection Service] were involved in an active administrative investigation of the matters at issue in this suit and had identified the probable offenders. When the investigation substantiated fraud by CIG, Holmes was publicly commended and received a $500 bonus from her employer for her service. In July of 1998, prior to the filing of Holmes' Complaint, the matter was referred to the Attorney General's office and accepted for civil action. Between 1998 and the time the Complaint was filed, the Attorney General's office continued to build a case against CIG. Because the PIS and OIG investigation and their subsequent referral of the matter to the Attorney General set the government "squarely on the trail of the alleged fraud," it would therefore "be contrary to the purposes of the FCA to exercise jurisdiction over [the relator's] claim." Because my fundamental task in interpreting the FCA is "to give effect to the intent of Congress," I must grant the United States' Motion to Dismiss Holmes. It makes no difference that Holmes, as part of her role as postmaster, initially alerted the PIS and OIG to the alleged wrongdoing and spurred them to investigate.

Id. at 126 (internal citations omitted).

We reject the district court's analysis. Applicability of the four-part jurisdictional inquiry set forth in § 3730(e)(4) does not hinge upon whether the government is actively involved in an investigation of the alleged fraud. Rather, the four-part jurisdictional inquiry is applicable in all cases filed by qui tam relators and, as outlined above, subject matter jurisdiction hinges upon the outcome of that inquiry. Although the presence or absence of an ongoing government investigation is relevant in applying the inquiry, it clearly is not the determinative factor. Under the district court's analytical framework, a prospective relator would have to report his or her information to the government and then immediately file suit in an attempt to act before the government instituted an investigation into the allegations. Further, the district court's analytical framework is contrary to Congressional intent in that it could prevent persons with legitimate inside knowledge of wrongdoing from pursuing a qui tam action.

The government asserts we can affirm the district court's judgment on alternative grounds. Focusing on parts two and four of the four-part inquiry, the government argues that a "public disclosure" occurred when government investigators questioned the three current and former CIG employees,[2] and, in any event, Holmes does not qualify as an

---

[2] Although it is uncontroverted that a number of postal employees were also interviewed during the course of the administrative investigation, the government makes no attempt to assert that these resulted in a "public disclosure" of the allegations at issue. Indeed, the government concedes that its "disclosures to former and current employees of CIG . . . have always been the sole basis for application of the public disclosure bar in this case." Govt. Br. at 37.

-10-

"original source" because she was obligated to report the alleged fraud (and thus did not "voluntarily" report it).  Because we conclude that no "public disclosure" occurred, under Fine we do not proceed to address the "original source" question.  The government also argues that a government employee who obtains information about fraud in the scope of his or her employment, and who is required to report that fraud, is not a "person" entitled to bring a civil action under 31 U.S.C. § 3730(b)(1).  We conclude the government employee who discovers fraud under these circumstances is a "person" entitled to bring suit under the FCA.  The fact that an employee learns of fraud in the course of his or her employment and has a duty to report fraud does not bar the government employee's FCA action.

*Public disclosure*

The term "public disclosure" is not defined in the FCA.  In Ramseyer, we held that the term "signifies more than the mere theoretical or potential availability of information."  90 F.3d at 1519.  "[I]n order to be publicly disclosed, the allegations or transactions upon which a qui tam suit is based must have been made known to the public through some affirmative act of disclosure."  Id.  Thus, we stated:

> The mere possession by a person or an entity of information pertaining to fraud, obtained through an independent investigation and not disclosed to others, does not amount to "public disclosure."  Rather, public disclosure occurs only when the allegations or fraudulent transactions are affirmatively provided to others not previously informed thereof.

-11-

Id. at 1521 (emphasis added).

Applying these principles to the case at hand, we conclude that a public disclosure did not occur when, during the course of their administrative investigation, government investigators questioned Benbrook, Benton, and Modrejewski. It is uncontroverted that all three individuals participated, to some degree, in the alleged fraudulent scheme, and thus were "previously informed" of the fraudulent scheme prior to their respective interviews with government investigators.[3]

The government concedes "there is some support" in Ramseyer and its progeny for the notion that, in order for there to be a public disclosure, the recipient of the disclosed information must be a stranger to the fraud. Govt. Br. at 22. Notwithstanding this concession, however, the government attempts to distinguish these cases by arguing that they "do not address the different situation where there have been no disclosures to strangers to the fraud, but the Government is fully aware of the allegations and is actively pursuing its own investigation." Id. Although the government's argument is not exactly clear, it appears the government is effectively asking us to modify the "public disclosure"

---

[3] Benbrook "transported many of the mailings at issue from CIG to the Howard post office" and "submitted false certifications to the Howard post office in order to qualify the CIG bulk mailings for the lower postage rates." Holmes Br. at 8. Benton had talked to Holmes about a bulk mailing in October 1995, and he was aware "that CIG's bulk mailings did not qualify for the lower postage rates CIG was receiving from the Howard post office." Id. at 9. Modrejewski "accompanied . . . Benton during the visit to the Poncha Springs post office" in October 1995, and "knew that the rates for CIG's bulk mailing quoted by [Holmes] . . . were higher than the rates CIG was receiving from the Howard post office." Id.

test if the government is aware of the allegations, actively pursuing an investigation into the allegations, and responsible for the disclosure(s).

The government argues that, at a minimum, its "disclosures to the two former CIG employees [Benton and Modrejewski] during its investigation [in this case] should trigger the public disclosure bar, even though it turned out that they were not strangers to the fraud." Id. at 34. However, the government does not clearly explain why the disclosure to these two individuals should be deemed sufficient to constitute a "public disclosure." Apparently, the government finds significant the fact that the two men no longer work for CIG. However, it offers no principled distinction between these two men and the one man (Benbrook) who still works for CIG, since all three men had prior knowledge of the alleged wrongdoing. Further, the government cites no case where a court has held that a disclosure to a person familiar with the fraud constitutes a "public disclosure" for purposes of § 3730(e)(4).

The government makes several other perplexing, and at times disingenuous, arguments in an effort to demonstrate why a "public disclosure" has occurred within the meaning of § 3730(e)(4). Citing United States ex. rel Doe v. John Doe Corp., 960 F.2d 318 (2d Cir. 1992), it suggests that "the Second Circuit has squarely held that disclosures made by the Government to employees of a defendant corporation during the course of a fraud investigation constitute public disclosures under section 3730(e)(4)(A)." Govt. Br. at 21. A review of the Doe decision, however, demonstrates that the holding is not as

broad as described by the government. In concluding that a public disclosure had occurred within the meaning of § 3730(e)(4)(A), the court focused not on the fact that the government generally had disclosed information to the defendant's employees, but rather that the disclosures had been made to many employees who were innocent and knew nothing about the defendant's wrongdoing:

> Here, . . . the allegations of fraud were not just potentially accessible to strangers, they were actually divulged to strangers to the fraud, namely the innocent employees of John Doe Corp. While the search warrant was being executed, the investigators spoke to numerous employees of John Doe Corp., some of whom knew of the fraud. But, more importantly, many of these individuals knew nothing about defendants' ongoing scheme; they were strangers to the fraud. These people were neither targets of the investigation nor potential witnesses. The government may have hoped that these individuals were potential witnesses, but it is clear that they were not.

960 F.2d at 322-23.[4] Thus, contrary to the government's assertions, the decision in Doe supports the conclusion that no public disclosure occurred in this case when the government interviewed persons who were involved in, or had prior knowledge of, the alleged wrongdoing.[5]

---

[4] In light of the fact that all three witnesses at issue in this case had prior knowledge of the fraud, it is unnecessary for us to decide whether questioning "innocent" employees of a company suspected of wrongdoing constitutes a "public disclosure" for purposes of the FCA.

[5] The government makes a similar, overly broad characterization of our decision in Fine. See Govt. Br. at 21 ("Likewise, this Court has made clear that a disclosure of allegations to even a single person outside the Government will trigger the jurisdictional bar."). Although we concluded that a "public disclosure" had occurred based upon the disclosure of information to a single individual, a key aspect of our conclusion was that the individual to whom the information was disclosed was "previously unconnected with the alleged fraud." 99 F.3d at 1005.

One other aspect of Doe requires mention. Throughout its "public disclosure" discussion, the government repeatedly cites Doe for the proposition that the purpose of the "public disclosure" test "was 'to prod the government into action, rather than allowing it to sit on, and possibly suppress, allegations of fraud when inaction might seem to be in the best interest of the government.'" Govt. Br. at 25 (quoting Doe, 960 F.2d at 323). A careful review of the Doe decision demonstrates that the government is again misconstruing what was stated. Importantly, the language quoted by the government does not refer to the "public disclosure" test implemented by the 1986 amendments, but rather to the 1986 amendments in general. See 960 F.2d at 323 ("One reason for the 1986 amendments was to prod the government into action."). We agree that "prodding" the government into action was obviously Congress' impetus for jettisoning the pre-1986 "government knowledge" standard, under which qui tam actions were barred if the federal government already possessed information upon which a qui tam action was based. That does not mean, however, that the purpose of the "public disclosure" test was the same. Rather, a review of the amendments and the legislative history makes clear that the purpose of the "public disclosure" test was to help identify and prevent "parasitic" qui tam actions.[6] E.g., Susan G. Fentin, The False Claims Act – Finding Middle Ground

_____

[6] The government makes several arguments that are tied to its mischaracterization of the Doe quotation. For example, the government argues that "[i]n cases where there is no evidence that the Government is aware of fraud allegations prior to a qui tam filing, . . . determining whether a disclosure of fraud allegations has been made to at least one individual 'not previously informed thereof' is a reasonable proxy for assessing whether

-15-

<u>Between Opportunity and Opportunism: The "Original Source" provision of 31 U.S.C.</u>

<u>§ 3730(e)(4)</u>, 17 W. New Eng. L. Rev. 255, 296 (1995) (noting that "Congress'

fundamental purpose in the 1986 amendments was to encourage qui tam suits that were

not parasitic in nature").

The government suggests that if we do not accept its position, it will be forced "to

make disclosures of relevant allegations to 'innocent' third parties in order to satisfy the

public disclosure bar - and ensure that opportunistic qui tam suits will be barred." Govt.

Br. at 31. We reject the government's argument for two reasons. First, we question its

blanket characterization of qui tam suits filed by government employees as

"opportunistic." While it is certainly possible for a government employee to file a

parasitic qui tam action (e.g., based on knowledge obtained secondhand through other

employees), that is not always the case. Here, for example, we do not view Holmes'

action as parasitic or opportunistic.[7] Rather, Holmes has direct and independent

---

the Government will be made aware of the allegations - and feel some pressure to act on them - even without the impetus of a qui tam suit." Govt. Br. at 30. However, the point of the public disclosure requirement is not to determine whether there is an impetus for the government to take action – the filing of the qui tam lawsuit takes care of that. Rather, the point of the public disclosure test is to determine whether the qui tam lawsuit is a parasitic one. The government also repeatedly suggests that "the sole purpose of looking for a disclosure is to determine if the Government is already on the trail of the fraud." Govt. Br. at 39. This is clearly incorrect.

[7] We reject the various criticisms leveled by the dissent at Holmes' suit and motives. A parasitic suit is one in which the relator uses information already in the public domain rather than information personally obtained in order to file suit. Holmes' suit obviously does not fit that mold. As for the dissent's comment that Holmes' "sole reason for filing [suit] was her own financial gain," Dissent at 18, that is obviously the motive of

knowledge of the fraud allegedly committed by CIG, since she is the person responsible for ferreting it out in the first place. Second, we believe the test we have adopted for determining whether a "public disclosure" has occurred is sound, and we are not persuaded there is an alternative test that accurately reflects the statutory language of § 3730(e)(4)(A).

The government next complains that a rule requiring disclosure "to individuals with no prior knowledge of the fraud would necessitate a bizarre mini-trial concerning the state of mind of various witnesses." Govt. Br. at 31-32. Obviously, a court faced with a public disclosure question may have to make factual findings regarding when and to whom a disclosure occurred. Nothing in the FCA suggests this is inappropriate. In any event, nothing of the sort was required in this case, where the government has conceded that the three witnesses at issue were all involved in, or at least had prior knowledge of, the alleged wrongdoing.

Finally, the government argues that the "stranger-to-the-fraud" test "is flawed on its own terms because not all 'strangers' have incentives to disseminate information about fraud, and some individuals who have prior knowledge of fraud may have compelling incentives not to further publicize it." Govt. Br. at 33. In other words, the government

---

most, if not all, relators. Without the financial incentives of the qui tam provisions, few, if any, qui tam actions would be filed. Further, as the language of § 3730(b)(1) makes clear, every qui tam action is considered to be filed on behalf of the relator and the government and both parties benefit from any financial recovery obtained in the action.

-17-

complains that "[t]he stranger-to-the fraud theory assumes that only those who have no prior knowledge of fraud are likely to make information about fraud public." Id. Although the government is undoubtedly correct that different people may have varying incentives to publicize information, that factor, in our view, is not relevant in determining whether a "public disclosure" has occurred within the meaning of the FCA. Moreover, the government has not offered a convincing test that could adequately replace the "stranger-to-the-fraud" rule.

We conclude that the government's disclosure of information to the three witnesses did not result in a "public disclosure" for purposes of § 3730(e)(4)(A).

*Original source*

Having concluded that no "public disclosure" occurred within the meaning of § 3730(e)(4), we need not determine whether Holmes was an "original source" of the information underlying her complaint. As previously discussed, where, as here, there was no public disclosure, the jurisdictional inquiry under § 3730(e)(4) ceases, regardless of whether the relator qualifies as an original source.

*"Person" entitled to bring action under 31 U.S.C. § 3730(b)(1)*

In its en banc brief, the government contends for the first time that Holmes cannot qualify as a potential relator under the FCA's general qui tam provision, 31 U.S.C.

§ 3730(b)(1). Specifically, the government argues that a government employee who obtains information about fraud in the scope of his or her employment and who is required to report that fraud is not a "person" entitled to bring a civil action under § 3730(b)(1).

"As in all cases involving statutory construction, our starting point must be the language employed by Congress, . . . and we assume that the legislative purpose is expressed by the ordinary meaning of the words used." American Tobacco Co. v. Patterson, 456 U.S. 63, 68 (1982) (internal quotations and citations omitted). "Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108 (1980).

Section 3730(b)(1) provides, in pertinent part, that "[a] person may bring a civil action for a violation of section 3729 for the person and for the United States Government." The word "person" is not defined in the FCA. The Dictionary Act, however, defines the word "person" for purposes of "determining the meaning of any Act of Congress" as including "individuals." 1 U.S.C. § 1. Likewise, authoritative dictionaries generally define the word "person" as a "human being." See Oxford English Dictionary Online (2002) (defining "person" as "[a]n individual human being; a man, woman, or child"); Webster's Third New Int'l Dictionary 1686 (1993) (defining "person" as "an individual human being"); Black's Law Dictionary 1142 (6th ed. 1990) (defining

"person" as "a human being (i.e. natural person)"). Thus, while it reasonably might be debated whether the word "person" includes or excludes certain types of entities (e.g., corporations), there can be no doubt that it unambiguously encompasses all individual human beings, including Holmes. Cf. Hafer v. Melo, 502 U.S. 21, 27 (1991) (concluding, in context of case filed pursuant to 42 U.S.C. § 1983, that "[a] government official in the role of personal-capacity defendant . . . fits comfortably within the statutory term 'person'"); see generally Smith v. United States, 508 U.S. 223, 228 (1993) ("When a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning.").[8]

The government also directs our attention to § 3730(b)'s title, "Actions by private persons," suggesting that this somehow limits who may qualify as a relator under the provision. In our view, § 3730(b)'s title, which was added by Congress in 1986, was simply intended as an easy reference for the reader of the statute, and not as a substantive amendment to the statute. In any event, the Supreme court has explained that the title of a statutory provision "'cannot limit the plain meaning of the text,'" and instead can only be used "'when [it] shed[s] light on some ambiguous word or phrase.'" Pennsylvania Dept.

_____

[8] The dissent disputes that it is redefining the term "person" as used in § 3730(b)(1). However, by applying its "distinctness" test, it seeks to narrow the plain meaning of the word "person" in order to exclude those natural persons who work for the federal government, have job duties that include uncovering and reporting fraud, and are participating in an ongoing investigation of alleged fraud. This three-part test is not contained within the language of the statute.

of Corr. v. Yeskey, 524 U.S. 206, 212 (1998) (quoting Trainmen v. Baltimore & Ohio R. Co., 331 U.S. 519, 528-29 (1947)).  Even assuming the word "person" is ambiguous (which we conclude it is not), employment of § 3730(b)'s title could only lead to one of two conclusions -- either that all government employees fall within the class of "persons" capable of filing suit under the qui tam provisions, or that all government employees fall outside that class.  See Black's Law Dictionary 1196 (indicating "private person" is a "[t]erm sometimes used to refer to persons other than those holding public office or in military services").  Not only would adoption of the latter conclusion result in a total ban on government employees filing suit under the qui tam act, it would render superfluous the specific exclusions adopted by Congress in 31 U.S.C. § 3730(e)(1) (prohibiting "former or present member[s] of the armed forces" from filing qui tam actions "against a member of the armed forces arising out of such person's service in the armed forces").

We also reject any assertion that the word "person" can be uniquely defined on the basis of a "scrivener's error."  Under the doctrine of "scrivener's error," a court may "give an unusual (though not unheard-of) meaning to a word which, if given its normal meaning, would produce an absurd and arguably unconstitutional result."  United States v. X-Citement Video, Inc., 513 U.S. 64, 82 (1994) (Scalia, J., dissenting).  Although there may be valid public policy reasons why certain government employees should be precluded from availing themselves of the qui tam provisions of the FCA, it cannot be said that defining the word "person" as encompassing all individuals, including

government employees, would produce an "absurd and arguably unconstitutional result." Nor can it be said that the interpretation now urged by the government was "genuinely intended [by Congress] but inadequately expressed." Id. In enacting the 1986 amendments to the FCA, it appears clear that Congress did not consider the question of whether government employees should be allowed to use information obtained in the course of their employment as the basis for a qui tam action. If we were to interpret the word "person" in the unusual manner urged by the government, we would end up "rewriting the statute rather than correcting a technical mistake." Id.

Finally, the government argues that a federal employee who discovers fraud in the course of his or her employment and who is required to report it, is not a "person" entitled to bring a civil action under § 3730(b)(1) because the acquisition of such information within the scope of a federal employee's job eliminates the critical distinction between the government and the individual qui tam plaintiff. This argument finds no support in the ordinary meaning of the word "person." In particular, we fail to see how the word could rationally be construed to exclude some, but not all, government employees, and under some, but not all, conditions. Further, we find no support for this argument in principles of agency law, which control the relationship between a federal employee, such as Holmes, and the government. For example, it is apparent that Holmes, in filing her complaint in this matter, was not acting within the scope of her employment and was therefore not acting "as the government" since she was not employed to file suit under the

-22-

FCA and there is no indication that the preparation or filing of her suit occurred substantially within the time and space limits imposed on her employment by the government. See Restatement (Second) of Agency § 228 (1957) (discussing when the conduct of a servant is or is not within the scope of his or her employment); see generally Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 755 (1998) (noting that "the Restatement . . . is a useful beginning point for a discussion of general agency principles"). Thus, even though she may have been acting "as the government," i.e., in her official capacity, when she obtained the information that now forms the basis of her qui tam complaint, it is apparent that she is acting as a "person," i.e., in her individual capacity, in filing and pursuing this qui tam action. Cf. Hafer, 502 U.S. at 25 (discussing, in context of § 1983 action, the difference between suing government officials in their official and individual capacities). This conclusion is further supported by the language of § 3730(b)(1) which states that a "person may bring a civil action for violation of section 3729 for the person and for the United States Government." (Emphasis added.) As applied here, Holmes brought this action in her individual capacity and sought relief for herself and for the government.

In our view, the dissent reads too much into the phrase "for the person and for the United States Government." As we read it, the phrase simply indicates that the relator functions as the partial assignee of the United States and emphasizes that both the relator and the government have an interest in the lawsuit and both will benefit should any

recovery occur.  See generally Vermont Agency of Natural Resources v. United States ex rel. Stevens, 529 U.S. 765, 772-74 (2000).  To suggest that the phrase also limits the term "person" by imposing a "distinctness" requirement stretches the phrase too far.  Further, if Congress intended to exclude some or all federal government employees from the class of persons able to file suit under § 3730(b)(1), it knew how to do so in a much clearer fashion than by use of the phrase "for the person and for the United States Government." For example, when Congress originally enacted 31 U.S.C. § 3729, the general liability provision of the FCA, it indicated that liability could be imposed only on "any person not in the military or naval forces of the United States, nor in the militia called into or actually employed in the service of the United States."  Act of Mar. 2, 1863, ch. 67, § 3, 12 Stat. 698.  Similar exclusionary language, e.g., "a person not employed in the service of the United States," could have been used in § 3730(b)(1) if Congress intended to carve out some type of exception for government employees.

The dissent's attempted narrowing of the term "person" flies in the face of the principle that "identical words used in different parts of the same act are intended to have the same meaning."  Dep't of Revenue v. ACF Indus., Inc., 510 U.S. 332, 342 (1994) (internal quotations omitted).  Not only is the term "person" used in other provisions of § 3730, e.g., § 3730(a) (authorizing the Attorney General to file suit against any "person"

determined to have violated § 3729), it is used throughout the FCA in general.[9]

The dissent charges us with construing § 3730(b)(1) as if it read "any person," and suggests there is a critical distinction between the phrase "a person" and the phrase "any person." However, the Supreme Court refuted this very notion in <u>Vermont Agency</u>, concluding the 1986 amendments to the FCA, which changed the phrasing of § 3729 from "a person" to "any person" had no effect on the meaning of the term "person." 529 U.S. at 783 n.12. We likewise conclude it is irrelevant whether the term "person" as used in § 3730(b)(1) is preceded by "a" or "any."

Finally, we believe that the history of the FCA's qui tam provision clearly rebuts the dissent's position. As originally enacted in 1863, the qui tam provision provided: "Such suit may be brought and carried on by any person, <u>as well for himself as for the United States</u>." Act of March 2, 1863, ch. 67, § 4, 12 Stat. 696 (emphasis added). The Supreme Court interpreted this language in a broad fashion, stating:

Neither the language of the statute nor its history lends support to the

---

[9] For example, § 3729(a) imposes liability on any "person" who commits one of several listed violations. A reading of this statute indicates, and case law confirms, that it is entirely possible that such "person" can include a government employee who commits violations related to employment (i.e., in the parlance of the dissent, a person who is acting "as the government). <u>See</u> <u>United States v. Carpentieri</u>, 23 F. Supp. 2d 433 (S.D. N.Y. 1998) (FCA suit brought by government against postal employee alleging that employee made false statements regarding his medical history in application for employment and in subsequent applications for disability benefits); <u>United States v. Bottini</u>, 19 F. Supp. 2d 632 (W.D. La. 1997) (FCA suit brought by government federal employee who allegedly presented false or fraudulent claims for payment of workers' compensation benefits under the Federal Employees Compensation Act).

contention made by respondents and the government. "Suit may be brought and carried on by any person," says the Act, and there are no words of exception or qualification such as we are asked to find. The Senate sponsor of the bill explicitly pointed out that he was not offering a plan aimed solely at rewarding the conspirator who betrays his fellows, but that even a district attorney, who would presumably gain all knowledge of a fraud from his official position, might sue as the informer.

United States ex rel. Marcus v. Hess, 317 U.S. 537, 546 (1943) (footnote omitted).

Obviously, the Court found no exception or qualification in the phrase "as well for himself as for the United States." Although the statutory phrase was altered by Congress in 1982 to read "for the person and for the United States Government," 31 U.S.C. § 3730(b)(1) (1982), we find it difficult to believe the change was intended to override Marcus and implement new restrictions on who could qualify as a relator. Thus, we believe that Marcus, to the extent it construed the qui tam provision as allowing a government official to file suit as a relator based upon information obtained in the course of his or her official duties, remains valid. In other words, if the original phrase, "as well for himself as for the United States," did not prohibit such relators, then neither does the current phrase, "for the person and for the United States Government."

III.

In a fall-back argument, the government offers several public policy reasons why federal employees should not be allowed to maintain qui tam actions based upon information obtained during the course of their employment. According to the government, "[p]ermitting Holmes to pursue a qui tam action on the facts here would be

-26-

inconsistent with her specific duty as a United States Postmaster to report fraud and with numerous legal duties imposed on all federal employees." Govt. Br. at 43. For example, the government argues, permitting Holmes to proceed as a relator would be contrary to federal regulations prohibiting "the use of public office for private gain," "the use of Government property or time for personal purposes," "the use of 'nonpublic Government information' to further private interests," and "the holding of any financial interests that may conflict with the impartial performance of Government duties." Id. at 44-45. The government further argues "there is no intent expressed in the [FCA] to permit qui tam suits by federal employees whose job it is to report fraud when they encounter it," and in fact "the legislative history of the 1986 amendments to the FCA reveals an intent to 'encourage more private enforcement suits,' . . . not to encourage suits by public employees seeking to capitalize on information learned during the course of their federal employment." Id. at 45. Finally, the government argues that "permitting qui tam suits by federal employees who are already under an obligation to disclose fraud would, as a practical matter, create perverse incentives for Government employees." Id. at 45-46.

Although the government's arguments have some appeal, the fact is that nothing in the FCA expressly precludes federal employees from filing qui tam suits. Prior to 1986, the FCA "precluded jurisdiction where the action was based upon information in the possession of the United States or any of its employees at the time of the suit." United States ex rel. Burns v. A.D. Roe Co., 186 F.3d 717, 722 n.5 (6th Cir. 1999). Thus,

"government employees effectively were prohibited from bringing claims under the qui tam provision." Id. The 1986 amendments to the FCA, however, revised the qui tam provision to allow any "person" to bring such a suit. See id.; 31 U.S.C. § 3730(b). "It is not clear whether Congress intended by the amendments to allow government employees to bring suit," Burns, 186 F.3d at 722 n.5, since nothing in the amendments or the legislative history thereto addresses the issue. Indeed, it appears that Congress gave no thought to the issue at the time it formulated and enacted the 1986 amendments. See Major David Wallace, Government Employees as Qui Tam Relators, 1996-AUG Army Law. 14, 22 (1996) ("The sponsors of the 1986 FCA amendments simply did not contemplate the issue of government employees using information they learned in the course of their duties as the basis of lawsuits in their own names."); Patrick W. Hanifin, Qui Tam Suits by Federal Government Employees Based on Government Information, 20 Pub. Cont. L.J. 556, 570-71 (1991) ("The legislative history does not expressly resolve the question of whether Congress intended to permit federal source suits. This is an instance where determining what Congress thought about an issue is difficult because Congress never thought about the issue, or at least did not express itself clearly.").

Post-1986 congressional activity suggests that Congress views the FCA as allowing federal employees to file qui tam actions.[10] "In 1990, the Subcommittee on

_____

[10] Although subsequent legislative history has been described as "less illuminating than the contemporaneous evidence," Hagen v. Utah, 510 U.S. 399, 420 (1994), we believe it is of some assistance in this case where there is little contemporaneous evidence

Administrative and Governmental Relations of the House Judiciary Committee held the first oversight hearings on the Act." Virginia C. Theis, Government Employees as Qui Tam Plaintiffs: Subverting the Purposes of the False Claims Act, 28 Pub. Cont. L.J. 225, 238 (1999). During those hearings, "[t]he Justice Department, the Inspector General of the Department of Health and Human Services, and John R. Phillips, an attorney who participated in drafting the amendments . . . , proposed limits on federal employees seeking to bring [FCA] actions." Id. "In 1992, Congress introduced two bills intended, in part, to address the issue of government employee relators." Wallace, supra, at 22. The first bill, H.R. 4563, "would have established limitations on government employees who file[d] qui tam suits based on information gained during the course of their employment." Theis, supra, at 238-39. The second bill, S. 2785, proposed banning "all qui tam suits brought by government employees who base[d] their actions on information obtained during the course of their government employment." Wallace, supra, at 23. Both bills had critics, and neither ultimately became law.

Consistent with this history, "no court has accepted the argument that government employees per se can never be relators in a qui tam action." Burns, 186 F.3d at 722 n.5. Although some judges from the Ninth Circuit have criticized the practice of allowing federal employees to bring qui tam actions, see United States ex rel. Fine v. Chevron,

---

of Congress' intent with respect to allowing government employees to file qui tam actions.

U.S.A., Inc., 72 F.3d 740, 747 (9th Cir. 1995) (Trott, J., concurring); id. at 749 (Hawkins, J. concurring), the court has, at least in one instance, allowed a federal employee to proceed as a relator in a qui tam action.  See Hagood v. Sonoma Co. Water Agency, 81 F.3d 1465, 1476 (9th Cir. 1996).  Likewise, the First Circuit has held that § 3730(e)(4)(A) does not per se "prevent government employees from bringing qui tam actions based on information acquired during the course of their employment."  United States ex rel. LeBlanc v. Raytheon Co., 913 F.2d 17, 20 (1st Cir. 1990).

In our view, the most persuasive discussion of the issue comes from the Eleventh Circuit in United States ex rel. Williams v. NEC Corp., 931 F.2d 1493 (11th Cir. 1991).  There, the relator was an attorney for the United States Air Force who, "[d]uring the course of his employment with the government, . . . became aware of bidrigging on the part of a corporation seeking telecommunications contracts with the United States."  Id. at 1494.  The district court dismissed the suit on the grounds that the FCA contained a jurisdictional bar against suits brought by government employees based upon information acquired in the course of their employment.  On appeal, the Eleventh Circuit initially determined that no public disclosure had occurred prior to the relator filing suit, and thus concluded that it was unnecessary for the relator to establish that he was an "original source" of the information on which his suit was based.  Id. at 1499-1501.  The court then rejected the government's argument that "the comprehensive bar against qui tam suits by government employees in the 1943 version of the [FCA] was never repealed by the 1986

-30-

amendments." Id. at 1501. In particular, the court concluded that "[t]he structure of the

1986 version of the Act and several basic canons of statutory interpretation make it clear

that no such general prohibition any longer exists." Id. at 1502. Finally, the court

rejected various public policy arguments forwarded by the government "for finding that

Congress intended to bar government employees from initiating qui tam suits based upon

information acquired in the course of their government employment." Id. at 1503.

Specifically, the court held:

> We recognize that the concerns articulated by the United States may
> be legitimate ones, and that the application of the False Claims Act since its
> 1986 amendment may have revealed difficulties in the administration of qui
> tam suits, particularly those brought by government employees. (Footnote
> omitted.) Notwithstanding this recognition, however, we are charged only
> with interpreting the statute before us and not with amending it to eliminate
> administrative difficulties. The limits upon the judicial prerogative in
> interpreting statutory language were well articulated by the Supreme Court
> when it cautioned:
>
>> Legislation introducing a new system is at best empirical,
>> and not infrequently administration reveals gaps or
>> inadequacies of one sort or another that may call for
>> amendatory legislation. But it is no warrant for extending a
>> statute that experience may disclose that it should have been
>> made more comprehensive. "The natural meaning of words
>> cannot be displaced by reference to difficulties in
>> administration." Commonwealth v. Grunseit,[ (1943) 67
>> C.L.R. 58, 80]. For the ultimate question is what has
>> Congress commanded, when it has given no clue to its
>> intentions except familiar English words and no hint by the
>> draftsmen of the words that they meant to use them in any but
>> an ordinary sense. The idea which is now sought to be read
>> into the [Act] . . . is not so complicated nor is English speech
>> so poor that words were not easily available to express the
>> idea or at least to suggest it.
>
> Addison v. Holly Hill Fruit Prods., 322 U.S. 607, 617-18, 64 S. Ct. 1215,

1221, 88 L. Ed. 1488 (1944).  Congress could have certainly indicated its desire to prevent government employees from filing qui tam suits based upon information acquired in the course of their government employment.  (Footnote and citations omitted.)  The False Claims Act is devoid of any statutory language that indicates a jurisdictional bar against government employees as qui tam plaintiffs.  We also note an absence of any clear indication that Congress intended such a bar to be implied in spite of the plain language of the statute.  Therefore, we decline to judicially create an exception where none exists.

Id. at 1503-04.

For these same reasons, we reject the government's public policy arguments and decline to hold that government employees are per se precluded from filing qui tam actions based upon information obtained during the course of their employment.  Although there may be sound public policy reasons for limiting government employees' ability to file qui tam actions, that is Congress' prerogative, not ours.[11]

IV.

We conclude that Mary Holmes was entitled to proceed as a relator under 31 U.S.C. § 3730(b)(1), and, because no "public disclosure" occurred within the meaning of 31 U.S.C. § 3730(e)(4), the district court had subject matter jurisdiction over her complaint.  We VACATE our prior opinion in this case, REVERSE the judgment of the

---

[11]  At oral argument, several members of the court noted the possibility that federal conflict-of-interest laws might be implicated by a government employee filing a qui tam action based upon information obtained in the course of his or her employment.  In particular, the possibility was mentioned that such an employee might have to forfeit all or part of the recovery obtained in a qui tam action.  Because the issue was not raised by the government or briefed by the parties, we find it unnecessary to resolve the issue at this time.

district court, and REMAND for further proceedings.

*01-1077, United States of America, ex rel. Mary L. Holmes v. Consumer Insurance Group*

**TACHA**, Chief Circuit Judge, dissenting, with whom **KELLY** and **LUCERO**, Circuit Judges, join.

## I. INTRODUCTION

This is the first case in which we have squarely faced the issue of whether a federal employee who (1) has a specific duty to report a specific kind of fraud, (2) discovered the alleged fraud at issue pursuant to her regular job duties, and (3) is participating in an ongoing fraud investigation as part of her job duties may bring a *qui tam* action based upon the alleged fraud that is the subject of the investigation. Our previous cases have expressly declined to address the question of when a federal employee may bring a *qui tam* action. *United States ex rel. Fine v. MK-Ferguson Co.*, 99 F.3d 1538, 1541 n.1 (10th Cir. 1996); *United States ex rel. Fine v. Advanced Sciences, Inc.*, 99 F.3d 1000, 1003 n.1 (10th Cir. 1996). Because *M-K Ferguson* expressly avoided this issue, it is no surprise that the four-part test we articulated there is inapposite here.

The *MK-Ferguson* test focuses exclusively on the public disclosure bar contained in section 3730(e)(4)(A). As such, the test assumes that jurisdiction exists unless the public disclosure bar applies. Neither *MK-Ferguson* nor any other case in this circuit, however, has analyzed the FCA's *initial* grant of jurisdiction to determine whether and

when its scope includes federal employees as potential relators. This latter inquiry logically precedes the question of whether the public disclosure bar applies. I therefore disagree with the majority's insistence that we rely on the *MK-Ferguson* test.

In a section titled "Actions by private persons," the FCA provides that "[a] person may bring a civil action for a violation of section 3729 for the person and for the United States Government." 31 U.S.C. § 3730(b)(1). This initial grant of jurisdiction plainly assumes a distinction between the government and the *qui tam* relator. Because such a distinction was not present in this case, I would hold that the district court lacked jurisdiction over Holmes' *qui tam* suit. Accordingly, I would affirm the district court's dismissal of Holmes from the case.

## II. DISCUSSION

Federal courts are courts of limited jurisdiction. When considering federal subject-matter jurisdiction, we must presume that jurisdiction is lacking, require the party asserting jurisdiction to prove that it exists, and resolve all doubts against jurisdiction. For several reasons, there is grave doubt as to whether jurisdiction exists in this case, and dismissal is therefore required.

First, a person is only a proper *qui tam* relator if she is distinct from the government. This requirement follows from the qualifying language in section 3730(b)(1)'s initial grant of jurisdiction, which only confers jurisdiction over *qui tam* actions brought "for the [relator] *and* for the United States Government." This distinction

is absent where, as in this case, the relator is (1) a government employee whose job duties include uncovering and reporting the particular type of fraud that grounds the *qui tam* action, and (2) the relator is participating in an ongoing investigation of that very same fraud.

Second, the Supreme Court has instructed us to employ statutory titles to resolve ambiguity arising from a discrepancy between the title and the text. Such ambiguity is present here, because the statute's title refers to actions by "private persons," while the text refers only to "a person." Per the Supreme Court's instruction, we must resolve this ambiguity by reading "person" as a reference to the "private persons" referred to in the title and not to persons acting as the government with regards to the fraud at issue.

Third, the ambiguity of the text and the fact that Congress did not expressly speak to the question of federal employee relators require us to consult the purposes of the *qui tam* provisions. Permitting Holmes' action would not serve any of the purposes of the FCA and its 1986 amendments and would, in fact, frustrate Congress' goal of preventing parasitic suits.

Fourth, finding jurisdiction over Holmes' action is glaringly inconsistent with specific prohibitions requiring federal employees to avoid conflicts of interest. Because the *qui tam* provisions do not per se exclude federal employee relators, they are necessarily in some tension with conflict of interest rules governing federal employees. The majority's construction of the initial grant of jurisdiction as plenary maximizes that

tension; a properly narrow construction of section 3730(b)(1) minimizes it.

A.     *The Presumption Against Jurisdiction*

We must remember, at the outset and throughout our consideration of the statutory language, that federal courts are courts of limited jurisdiction.  The first step in our analysis is to presume that the district court lacks jurisdiction and to require the party asserting jurisdiction to allege and prove that jurisdiction exists.  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *Montoya v. Chao*, 296 F.3d 952, 955 (10th Cir. 2002); *MK-Ferguson*, 99 F.3d at 1543; *United States ex rel. Precision Co. v. Koch Indus.*, 971 F.2d 548, 551 (10th Cir. 1992).  Moreover, we must strictly construe statutes conferring jurisdiction, resolving *any* doubts against jurisdiction.  *Advanced Sciences*, 99 F.3d at 1004; *MK-Ferguson*, 99 F. 3d at 1543-44.  Thus, a scintilla of doubt as to jurisdiction over Holmes' suit mandates dismissal.

B.     *The Distinction Between the Qui Tam Relator and the Government*

In construing a statute, "our overriding purpose is to determine congressional intent."  *Chickasaw Nation v. United States*, 208 F.3d 871, 878 (10th Cir. 2000) (citing *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 570 (1982)).  To determine a statute's plain meaning, "'[we] must look to the particular statutory language at issue, as well as the language and design of the statute as a whole."  *Id.* (quoting *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988)).

The FCA provides, in a section headed "Actions by private persons," that "[a]

person may bring a civil action for a violation of section 3729 for the person and for the United States Government." 31 U.S.C. § 3730(b)(1). The Act does not make explicit the class of persons eligible to file civil suits under subsection (b). As the majority acknowledges, Congress did not explicitly consider the possibility of *qui tam* suits by government employees.[1] Maj. op., *supra* at 22, 28. But while we lack any *direct* congressional statement, or even any legislative history, the text of section 3730(b)(1) does provide direction. Our starting point must be the meaning of Congress' statement that "[a] person may bring a civil action . . . for the person and for the United States Government." 31 U.S.C. § 3730(b)(1). Determining the scope of the initial grant of jurisdiction logically precedes any consideration of the public disclosure and original source inquiries.

The phrase "for the person *and* for the United States Government" reveals a fundamental assumption about the individuals filing *qui tam* suits – namely, that they are distinct from the government. The government is not a discrete organism; it exists and acts only through people. The government cannot get up out of its chair and pursue

---

[1] The majority does address *subsequent* attempts in Congress to address this issue. Maj. op., *supra* at 28-29. These attempts never resulted in amendments to the FCA, however, and discussions that fail to produce legislation cannot, by definition, constitute legislative history. Congress has not spoken to the issue, and, "in any event, the view of a later Congress cannot control the interpretation of an earlier enacted statute." *O'Gilvie v. United States*, 519 U.S. 79, 90 (1996) (internal citations omitted). Post-1986 congressional discussions are irrelevant to the meaning of the statute as a prior Congress wrote it.

fraud; if it does so at all, it does so through its employees. The phrase, "for the person *and* for the United States Government," then, requires that there be some distinction between a potential *qui tam* relator and the people acting as "the government" with regard to the fraud at issue. I therefore read the statute as authorizing *qui tam* actions only by those individuals who are distinct from the government.

When a federal employee acting pursuant to job responsibilities obtains information about possible fraud, that employee obtains that information *as* the government. A federal employee who is involved in an ongoing government investigation pursuant to employment duties *is* the government. The distinction between the individual federal employee and the government disappears in this context. Therefore, such an employee cannot use that information to file an action under section 3730(b) "for the person and for the United States Government."

Holmes is such an employee.[2]   She initially learned of the alleged fraud while

_____

[2]As the majority correctly points out, the reason Holmes knew of the fraud allegedly committed by CIG was because "*she is the person responsible for ferreting it out in the first place*." Maj. op., *supra*, at 17 (emphasis added). This is precisely the point. The outcome, in my judgment, is dictated by the facts in this case. At some point, a potential relator's specific duty to discover and report a particular kind of fraud aligns so closely with the alleged fraud grounding her *qui tam* action that the distinction required by section 3730(b)(1) – between the employee as *private relator* and the employee as *the government* – collapses. The test for when that distinction collapses is necessarily fact-driven, and I do not propose that we attempt to answer in advance every scenario that might arise. We should allow the caselaw to develop the contours of such a fact-specific test.

In this case, three facts situate Holmes outside the scope of section 3730(b)(1):  (1) Holmes' express duty as postmaster to discover and report the particular kind of postal

-6-

acting in her capacity as postmaster. She learned that the alleged fraud was ongoing while acting as a postmaster trainer, a role within the scope of her employment. Once she had obtained information about this particular type of fraud, she had a specific duty as a postmaster to report it. Regulation 224.3 in the Postal Service's Administrative Support Manual requires a postmaster to report by memorandum "[f]ailure to pay postage, violation of franking privilege, misuse of penalty mail, depositing of advertising material in mailboxes without payment of postage, *and similar schemes to evade payment of postage*." (Emphasis added). Holmes does not dispute that this regulation applies to her. Nothing in the regulation limits its scope, and Holmes has provided no evidence to suggest that its scope is limited to fraud conducted or discovered at her home post office.[3] In fact, Holmes concedes its applicability when she states in her brief that she "could have

---

fraud alleged against CIG; (2) the fact that she discovered the alleged fraud as part of her job duties; and (3) the fact that she is participating in the ongoing government investigation – which indicates that the government has neither declined to pursue nor covered up the alleged fraud. But the fact that Holmes may not bring this *qui tam* action in no way implies a per se ban on federal employee relators. It is the specific alignment of her job duties with the particular fraud alleged, along with her participation in the ongoing government investigation, that disqualify her. The relationship between a particular federal employee's job duties and the particular fraud alleged will vary from case to case. For example, nothing in this decision would prevent Holmes from filing a *qui tam* action based upon information she obtained, outside the scope of her federal employment, regarding bidrigging in the Department of Defense, because her express job duties do not direct her to discover and report such fraud. Likewise, nothing in this opinion would prevent a federal employee in the Department of Energy from basing a *qui tam* action on the alleged fraud in this case.

[3] Moreover, Boyle's affidavit specifically states that a postmaster who is acting as a postmaster trainer "is not relieved of his responsibilities as a postmaster, as they pertain to reporting fraud."

-7-

met her job description responsibility to report suspected fraud by simply sending a memorandum to the Postal Inspection Service." I therefore conclude that Holmes, a federal employee with a specific duty to report the particular type of fraud at issue and a participant in the ongoing investigation, is outside the FCA's initial grant of jurisdiction.

My statutory analysis has been criticized as requiring an unwarranted redefinition of the word "person." It requires no such thing. We must read the word "person" in context. The relevant inquiry is what the first *sentence* of section 3730(b)(1) means, not what one *word*, removed from context, means.[4] I can only conclude, therefore, that those who have criticized my analysis as a factually dependent redefinition of the word "person" have either ignored or rejected the premise of my analysis, which is that we should read *all the language* granting jurisdiction in order to construe its scope.

My reading of the statute does not focus on the word "person" or on any other word in isolation. I know of no principle of statutory construction that instructs us – or permits us – to apply the plain meaning of *individual words* of a statute in isolation, without considering the statutory context. *See, e.g., United States Nat'l Bank of Oregon v. Indep. Ins. Agents of America, Inc.*, 508 U.S. 439, 455 (1993) ("Over and over we have stressed that '[i]n expounding a statute, we must not be guided by a single sentence or

---

[4]*See, e.g., Things Remembered, Inc. v. Petrarca*, 516 U.S. 124, 134 (1995) ("It is a fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used.") (quoting *Deal v. United States*, 508 U.S. 129, 132 (1993) (internal quotations omitted)).

member of a sentence, but look to the provisions of the whole law, and to its object and policy.") (internal citations and quotations omitted). Rather, my analysis seeks to understand from the statutory context what class of persons Congress intended to be potential *qui tam* relators.

The majority construes section 3730(b)(1) as conferring jurisdiction over suits brought by "any person," subject only to the four subsequent express exclusions. This construction ignores the remainder of the very brief statutory language, which qualifies the initial grant of jurisdiction.[5] Moreover, this interpretation turns on its head the general rule that we must construe jurisdictional grants narrowly.

By construing the initial grant as plenary, the majority follows the Eleventh Circuit's analysis in *United States ex rel. Williams v. NEC Corp.*, 931 F.2d 1493 (11th Cir. 1991). But the analysis in *Williams* turns upon the same crucial error made by the majority: instead of applying the entire sentence of section 3730(b)(1), it applies only the first two words ("a person").

The *Williams* court makes a fundamental and crucial assumption: that the 1986 amendments begin by conferring jurisdiction upon *everyone*, then restrict it in the four express exceptions.

---

[5] For this reason, the canon of *expressio unius est exclusio alterius* is inapplicable. The four subsequent, express exclusions operate only within the scope of the initial grant. The mere existence of subsequent express exceptions cannot *ex ante* transform a qualified grant of jurisdiction into a plenary one.

In defining the classes of persons eligible to bring qui tam actions, Congress had a choice:

> It could have chosen to make eligible as qui tam relators only certain defined groups of persons and exclude all others or it could have chosen to include all persons as eligible qui tam relators with certain specific exceptions. It chose the latter scheme. *The statute first permits any "person" to bring a qui tam action*, and then specifically excludes four groups. . . . Government employees are included in the general universe of permissible qui tam plaintiffs unless, in the particular circumstances, they fall into one of the four specifically defined excluded groups.

931 F.2d at 1502 (quoting *Erickson ex rel. United States v. Am. Inst. of Biological Sciences*, 716 F. Supp. 908, 912–13 (E.D. Va. 1989)) (emphasis added).

This analysis is rather conclusory and depends completely on the assumption that (1) the statute begins by conferring jurisdiction over "*any* person" and (2) the rest of section 3730(b)(1) is meaningless. According to *Erickson*, on which the *Williams* court relied for its construction of the jurisdictional provisions, the statute "permits any 'person' to bring a *qui tam* action"; and Congress therefore intended that "Government employees are included in the general universe of permissible qui tam plaintiffs unless, in the particular circumstances, they fall into one of the four specifically excluded groups." *Erickson*, 716 F. Supp. at 912-13.

Taking the same view, the majority boldly states that the 1986 amendments "revised the qui tam provision to allow *any* 'person' to bring such a suit." Maj. op., *supra*, at 27 (emphasis added). But the statute *does not* begin by conferring jurisdiction

upon "any person." It says that "a person may bring a civil action for violation of section 3729 *for the person and for the United States Government*." That is, the original grant of jurisdiction extends not to everyone but only to those persons in a position to bring suit on behalf of themselves *and* the government. If there is no distinction between the person and the government, section 3730(b)(1) does not confer jurisdiction on the person.[6] Following *Erickson* and *Williams*' lead, the majority has simply reworded the statute.

Reading the words "a person" out of context distorts the meaning of the statute by ignoring the rest of the jurisdictional language. This we may not do. A unanimous Supreme Court recently reminded us that

> [statutory] text consists of words living a communal existence . . . the meaning of each word informing the others and all in their aggregate tak[ing] their purport from the setting in which they are used. . . . Over and over we have stressed that [i]n expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy. . . . Statutory construction is a holistic endeavor, and, *at a minimum, must account for a statute's full text*.

*United States National Bank of Oregon v. Independent Insurance Agents of America, Inc.*, 508 U.S. 439, 454-55 (1993) (internal citations and quotations omitted) (emphasis added).

---

[6]In holding that the *qui tam* provisions of the FCA do not impose a per se ban on government employees as relators, the First Circuit cited the same language from *Erickson* in *United States ex rel. LeBlanc v. Raytheon Co.*, 913 F.2d 17 (1st Cir. 1990). Neither court seems to have considered the language very carefully, and both repeat the *Erickson* construction of the language without apparent analysis, as if it were a *fait accompli*. It is not. Furthermore, at issue in *Erickson* was whether the statute imposed a per se ban on federal employee relators, an issue distinct from the one before us – whether relators *in the course of their duties and thereby acting as the government* are within the scope of the jurisdictional provisions.

-11-

If, as we must, we assume that Congress intended the entire sentence of section 3730(b)(1) to apply, we cannot begin the jurisdictional analysis with the assumption that there must be some express or clearly implied *subsequent* exclusion. Rather, we begin with the assumption that when Congress delineated the class of persons who may bring *qui tam* actions, that class only included persons distinct from the government. The words "a person" do not confer jurisdiction over *everyone* unless they are read out of context.

C.      *The Section Title: "Actions by Private Persons"*

The initial grant of jurisdiction in section 3730(b)(1) appears under the heading "Actions by Private Persons." Although the Supreme Court has cautioned that a heading may not limit a statute's plain and unambiguous meaning, *see, e.g.*, *Pennsylvania Dep't of Corr. v. Yeskey,* 524 U.S. 206, 212 (1998), the Court has on numerous occasions employed headings and titles as "tools available for the resolution of a doubt," *Bhd. of R.R. Trainmen v. Baltimore & O.R. Co.*, 331 U.S. 519, 529 (1947).[7] A title or heading is

---

[7] *See, e.g.*, *Almendarez-Torres v. United States,* 523 U.S. 224, 234 (1998) (quoting *Bhd. of R.R. Trainmen*, 331 U.S. at 528-29) (noting that "'the title of a statute and the heading of a section'" are "'tools available for the resolution of a doubt'" about a statute's meaning, and relying on presence of the word "penalties" in title of section as evidence that the section dealt with substantive crime); *Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) (employing title of regulation to resolve "any possible ambiguity"); *FTC v. Mandel Bros.*, 359 U.S. 385, 388–89 (1959) (noting that the "Title of [an] Act . . . though not limiting the plain meaning of the text, is nonetheless a useful aid in resolving ambiguity" and beginning the Court's construction of false invoicing provisions of the Fur Products Labeling Act by looking to its title and its underlying purposes); *Maguire v. Comm'r*, 313 U.S. 1, 9 (1941) (employing title of tax statute as evidence of congressional

-12-

useful when it "shed[s] light on some ambiguous word or phrase." *Id.* If there is ambiguity, then, in the text of section 3730(b), and if its heading helps clarify matters, we should consult the heading as long as we do not invoke it to limit the text's plain meaning.

In *INS v. National Center for Immigrants' Rights*, 502 U.S. 183 (1991), a unanimous Supreme Court relied on the title of a regulation in circumstances similar to those in this case. *INS* required the Court to construe a section of a regulation entitled "Condition against unauthorized employment." The text of the section referred only to "condition barring employment," without specifying "unauthorized" employment. This inconsistency was sufficient to create ambiguity in the text: "The most critical ambiguity in the regulation is whether the proposed no-work conditions bar all employment or only *unauthorized* employment . . . . Although the relevant paragraph of the regulation is entitled 'Condition against unauthorized employment,' the text describes the restriction more broadly, as a 'condition barring employment.'" *Id.* at 189. The Court indicated that, in such circumstances, it would read the text as if the omitted adjective were present:

> In other contexts, we have stated that the title of a statute or section can aid in resolving an ambiguity in the legislation's text. Such analysis obtains in this case as well. The text's generic reference to "employment" should be read as a reference to the "*unauthorized* employment" identified in the paragraph's title.

intent to confine application of its text to specific property owned by decedent at the time of death).

-13-

*Id.* at 189 (emphasis in original) (internal citations omitted).

Section 3730(b)(1) is ambiguous, and the section heading aids us in resolving that ambiguity. None of the individual words in section 3730(b)(1) is exotic or confusing, but we must construe the entire sentence, not individual words out of context. To me, the qualifying phrase "for the person *and* for the United States Government" plainly assumes a distinction between the government and the *qui tam* relator. In addition to the qualifying phrase in the text itself, there is also dissonance between the title's reference to "private persons" and the text's more general reference to "a person."

Thus, ambiguity resides in (1) the phrase by which Congress qualifies the "person" entitled to bring a *qui tam* action and (2) the omission from the text of the adjective "private," which modifies "persons" in the heading. To resolve this ambiguity, the Supreme Court instructs us to read the word "person" in the text as a reference to the "private persons" more specifically identified in section 3730(b)'s heading. *INS*, 502 U.S. at 189.

Holmes obtained information of fraudulent activity in the course of her employment; she was required to report that information pursuant to her specific job duties; and she was a participant, as part of her job duties, in the ongoing government investigation of that alleged fraud. She is clearly not a "private person" in this context, and she is therefore not a proper *qui tam* plaintiff under the FCA. 31 U.S.C. § 3730(b)(1).

I strongly disagree with the majority's assertion that employing section 3730(b)'s title mandates a conclusion either that (1) *all* federal employees are within "the class of 'persons' capable of filing suit under the qui tam provision," or (2) *all* federal employees fall outside that class. Maj. op., *supra*, at 21. This case has never been about a per se ban on federal employee relators, and the assertion fails for two reasons. First, the majority premises its argument on a faulty assumption – namely, that my analysis is based upon an unwarranted redefinition of "person." It is not. Rather, I consider the nexus present between the person and the government in deciding whether the potential relator satisfies section 3730(b)(1)'s distinctness requirement. Second, the only government employees outside the initial grant of jurisdiction are those acting *as* the government with regard to the particular evidence of fraud that grounds their *qui tam* suits. I do not argue – and the facts of this case make it unnecessary for me to argue – that Holmes should be barred merely because she is a federal employee. Rather, I would hold that she is outside the scope of the jurisdictional provisions because her job duties expressly require her to uncover and report the particular type of fraud that grounds her *qui tam* action. She therefore acts *as* the government with regard to that information and cannot bring a *qui tam* action for herself *and* for the government.

D.     *The Purposes of the FCA and the 1986 Amendments*

It is well established that when statutory language and legislative history are inadequate, suggesting that Congress did not think about a particular problem that might

arise when applying a statute, "we must analyze the policies underlying the statutory provision to determine its proper scope." *Rose v. Lundy*, 455 U.S. 509, 516-17 (1982); *see also, e.g., United States v. Sisson*, 399 U.S. 267, 297-98 (1970) ("The axiom that courts should endeavor to give statutory language that meaning that nurtures the policies underlying legislation is one that guides us when circumstances not plainly covered by the terms of a statute are subsumed by the underlying policies to which Congress was committed"). The majority and I agree that "[i]t is not clear whether Congress intended by [the 1986] amendments to allow government employees to bring suit." Maj. op., *supra* at 28 (citation omitted). Congress apparently gave no thought to the issue. *Id.* We must, therefore, consider the purposes of the FCA's *qui tam* provisions to determine the proper scope of section 3730(b)(1).

While my analysis remains grounded in the statutory language of section 3730(b)(1), the purposes of the FCA's *qui tam* provisions and its 1986 amendments bolster the conclusion that jurisdiction is lacking. "Congress instituted the *qui tam* provisions of the FCA to encourage private citizens to expose fraud that the government itself cannot easily uncover." *United States ex rel. Fine v. Sandia Corp.*, 70 F.3d 568, 572 (10th Cir. 1995). Moreover, the 1986 amendments' expansion of jurisdiction over *qui tam* actions reflects Congress' "concern that the government was not pursuing known instances of fraud." *Ramseyer*, 90 F.3d at 1520 (quoting *MK-Ferguson Co.*, 861 F. Supp. at 1551). The statute as amended aims "(1) to encourage private citizens with first-hand

-16-

knowledge to expose fraud; and (2) to avoid civil actions by opportunists attempting to capitalize on public information without seriously contributing to the disclosure of the fraud." *Id.* at 1519-20 (quoting *Precision*, 971 F.2d at 552).

Exercising jurisdiction over Holmes' action would not serve the FCA's purposes of encouraging exposure of fraud and would frustrate its goal of preventing parasitic suits. First, where a government employee has a duty to report fraud, as Holmes does as postmaster, the information underlying that employee's suit does not constitute information that the government would not otherwise uncover. The duty to report itself assures that her information is the government's information.

Second, a *qui tam* action by someone in Holmes' position is not prodding the government to pursue fraud allegations it would not otherwise pursue. The undisputed facts show that the government is engaged in active pursuit of the alleged fraud. In fact, Holmes' own brief states plainly that encouraging government action was *not* the purpose of her suit: "After Relator was confident that the government was adequately investigating her information, she filed her lawsuit under the FCA to recover her lawful share of the proceeds."[8] Therefore, permitting Holmes' *qui tam* suit would not serve the

---

[8] The majority misreads both my analysis and the statute when it suggests that Holmes acted "as the government" when she obtained the information that grounds her *qui tam* actions and as a "person" when she filed that action to secure a "share of the proceeds" – thereby, the argument goes, satisfying section 3730(b)(1)'s requirement that she file on behalf of herself and the government. Maj. op., *supra*, at 22-23. First, my construction of the initial grant of jurisdiction is *not* premised on a factually dependent redefinition of the term "person"; thus, the majority's attempt to associate "person" with

-17-

FCA's purposes of exposing fraud or encouraging the government to pursue fraud allegations.

Nor are these circumstances ones in which a private person needs to be encouraged to expose fraud. On the contrary, having acquired the information in the course of her duties as a postmaster, Holmes had a specific obligation as a postmaster to report it. Again I note that, in the performance of her duties as a postmaster, she *is* the government. As such, she acquired the information for the government. Moreover, a federal employee who reports a private company's fraud on the government does not have the same fear of reprisal as a company insider who acts as a whistleblower, further reducing the need for financial incentives to encourage them to disclose information about fraud.[9]

Finally, allowing federal employees' *qui tam* suits in these circumstances would not serve, and would in fact frustrate, Congress' goal of preventing parasitic suits. I agree

Holmes' "individual capacity" and "government" with her "official capacity" misses the point. It also, ironically, appears to engage in factually dependent reading of "person." Second, if the qualifying language "for the person and for the United States Government" means anything at all, it means that there is some distinction between the two that is *relevant to the existence of jurisdiction*. The majority's reading requires that a single individual can be both at the same time, simply because "the preparation and filing of her suit" need not occur at her workplace. *Id*. Such a construction renders the language meaningless – as does the majority opinion in general. Moreover, as Holmes acknowledges, the official investigation was already underway when she filed her action, and her sole reason for filing was her own financial gain. It is a parasitic suit, filed solely on her own behalf, not the government's.

[9] In addition to the financial incentives for a *qui tam* plaintiff, the statute addresses this particular concern by providing that an employee who suffers retaliatory action as a result of pursuing or assisting in an action under section 3730 "shall be entitled to all relief necessary to make the employee whole." 31 U.S.C. § 3730(h).

with the majority that "the point of the public disclosure test is to determine whether the *qui tam* suit is a parasitic one." Maj. op., *supra*, at 16 n.6. The public disclosure bar, however, does *not* address the problem of parasitic suits by government employees; it only addresses the problem of parasitic suits by private persons, who have no access to government information that has not been "publicly disclosed."

Section 3730(b)(1)'s distinctness requirement furthers the FCA's purposes. The statute's authorization of suits by "[a] person . . . for the person and for the United States Government," along with the section heading "Action by Private Persons," reflect a contrast between public and private, between the federal government's information and private citizens' independent knowledge. Our analysis in *Ramseyer* is instructive. In that case, we concluded that the public disclosure bar requires actual, not merely theoretical, disclosure. 90 F.3d at 1519. Underlying our reasoning was the assumption that potential *qui tam* relators do not have access to governmental information that has not been made public:

> Information to which the public has potential access, but which has not actually been released to the public, cannot be the basis of a parasitic lawsuit because the relator must base the *qui tam* suit on information gathered from his or her own investigation. If a specific report detailing instances of fraud is not affirmatively disclosed, but rather is simply ensconced in an obscure government file, an opportunist *qui tam* plaintiff first would have to know of the report's existence in order to request access to it.

*Id.* at 1520. This rationale, however, does not apply to government employees who know of the allegations because of their jobs. Government employees frequently have access to

government information even though it has not been "publicly disclosed," as defined in *Ramseyer*. Thus, there is a potential for parasitic *qui tam* suits by government employees before "public disclosure" occurs, just as there is a potential for such suits by private persons following public disclosure. In my view, Holmes' suit is a parasitic one for precisely this reason.[10] Holmes learned of the alleged fraud while acting in the scope of her employment as a federal employee, and she had a specific duty to report this particular type of information. As such, she obtained the information *on behalf of* the government, and the information *belongs to* the government. Of course, these facts also mean that she had access to the information regardless of whether it had been "publicly disclosed."[11]

### E.    Conflict of Interest

Federal employees' obligations to avoid conflicts of interest further distinguish them from others who file *qui tam* suits. Clearly, Congress did not intend to adopt a per se ban against federal employee relators – the four express exclusions directed towards federal employees that follow the initial qualified grant of jurisdiction would otherwise be

---

[10] Again I note that Holmes' own brief evidences a specific intent to piggyback on the government's efforts.

[11] The majority concludes that the "original source" inquiry need not be conducted here because there has been no public disclosure. The majority nevertheless seems to assume that Holmes would qualify as an original source, for it states – borrowing a phrase directly from the statutory definition of "original source," 31 U.S.C. § 3730(e)(4)(B) – that Holmes has "direct and independent knowledge" of the alleged fraud. Maj. op., *supra*, at 16-17.

superfluous. Thus, the FCA will at times be in tension with conflict of interest provisions governing federal employees. But the glaring inconsistency between these limitations on federal employees and allowing federal employees to pursue *qui tam* suits based upon information obtained as part of their job duties, and which their jobs require them to report, supports the conclusion that Congress intended to minimize the extent to which the FCA derogated from the requirement that federal employees avoid conflicts of interest. The majority's broad reading of the initial grant of jurisdiction maximizes the inherent tension between the *qui tam* provisions and the conflict of interest rules. We are, however, bound to construe statutes granting federal subject-matter jurisdiction narrowly; such a construction also minimizes the tension between section 3730(b)(1) and the conflict of interest rules.

The most relevant among the specific prohibitions on federal employees is the prohibition on the use of "nonpublic Government information"[12] to "further any private interest." 5 C.F.R. §§ 2635.101(b)(3), 2635.703(a). Other regulations prohibit participation in a government matter in which the employee has a financial interest, *id.* §§ 2635.402, 2635.501, 2635.502; the use of public office for private gain, *id.* §§ 2635.101(b)(7), 2635.702; the use of government property or time for personal purposes, *id.* §§ 2635.704, 2635.705; and holding a financial interest that may conflict

---

[12] "Nonpublic information" means "information that the employee gains by reason of Federal employment and that he knows or reasonably should know has not been made available to the public." 5 C.F.R. § 2635.703(b).

with the impartial performance of government duties, *id.* § 2635.403. Moreover, Congress has specifically imposed criminal penalties on government employees who participate in matters in which they have financial interests. 18 U.S.C. § 208.

Holmes based her *qui tam* suit on information that she acquired in the course of her employment as a postmaster and had a specific duty to disclose. At least while the government is conducting an ongoing investigation of the allegations, Holmes' claim for a portion of the proceeds directly reduces the amount that the government may ultimately collect. To allow an employee in Holmes' position to pursue *qui tam* claims in these circumstances would create a personal financial stake in the relevant information.[13] "Rather than perform their jobs as they are required, government employees obligated to disclose suspected fraud may inappropriately hide fraud from their supervisors while preparing their *qui tam* actions for filing." *United States ex rel. Biddle v. Bd. of Trustees*, 161 F.3d 533, 542 (9th Cir. 1998) (citation omitted). We cannot conclude that Congress intended to create an incentive for government employees to withhold information about suspected fraud contrary to their specific employment obligations.[14]

_____

[13] Indeed, according to the majority opinion, it appears that Congress intended to authorize a federal employee to "cash in" whenever her job duties bring evidence of fraud across her desk – even if her job is to investigate fraud.

[14] I contrast my reasoning here with the primary policy arguments that the Eleventh Circuit rejected in *Williams* involving administrative difficulties – specifically, interference with the government's case and premature disclosure of allegations to defendants. 931 F.2d at 1503. I agree that these concerns do not require excluding government employees from the class of eligible *qui tam* plaintiffs, and we accord them no weight. The statute demonstrates that Congress considered these concerns (though not

The FCA does not specify how it applies to federal employees. The majority's construction of the initial grant of jurisdiction as plenary exacerbates the inherent tension between the *qui tam* provisions and the conflict of interest rules, whereas a properly narrow construction of section 3730(b)(1) minimizes that tension. We must assume that Congress did not intend to abrogate the conflict of interest rules beyond what is required for a properly narrow construction of section 3730(b)(1)'s initial grant of jurisdiction. To do otherwise needlessly fosters incoherence and flies in the face of our obligation to construe statutes granting federal subject-matter jurisdiction narrowly. Assuming that Congress intended for federal employees to adhere to applicable statutes and regulations, we should construe the FCA in a manner that is consistent with federal employees' obligations. In light of these obligations, along with the statute's evident purposes and

specifically with respect to government employees) and chose to mitigate them by other means. 31 U.S.C. § 3730(b)(2)-(3) (requiring that a *qui tam* plaintiff file the complaint under seal, and allowing the government to seek an extension of the 60-day period during which the complaint remains under seal); (b)(4) (allowing the government to take over a *qui tam* action by intervention); (c) (limiting the *qui tam* plaintiff's rights when the government intervenes).

The *Williams* court, although it noted the government's argument that "the False Claims Act should not allow a personal reward to government employees for the 'parasitical' use of information obtained and developed in the course of government employment," 931 F.2d at 1503, did not consider the plaintiff's particular employment obligations in this context. Such obligations are an important aspect of my analysis of Holmes' case. Moreover, to the extent that I rely upon the obligations of federal employees, I use these to inform my interpretation of the statutory language in section 3730(b)(1). I thus disagree with the Eleventh Circuit's statement that "[t]he False Claims Act is devoid of any statutory language that indicates a jurisdictional bar against government employees as *qui tam* plaintiffs." *Williams*, 931 F.2d at 1504.

-23-

section 3730(b)(1)'s distinction between the government and the private relator, it is my view that Congress did not intend to permit a federal employee's *qui tam* suit where she has a specific duty to report the specific kind of fraud that grounds the suit and is participating in an ongoing investigation as part of her job duties.

### III. CONCLUSION

The words "a person" in the text do *not* indicate that section 3730(b)(1)'s initial grant of jurisdiction is plenary. The qualifying language in the text ("for the person *and* the . . . Government") must be given meaning, as must the adjective "private" in the title. The statute simply does not say that *any* person may bring a *qui tam* action. Such a reading ignores both the text of the qualifying phrase and the fact that the section refers to private persons, not federal employees participating as part of their job duties in the very investigations that ground their *qui tam* actions. It produces results that conflict with the statute's purposes, and it maximizes the inherent tension between the FCA and conflict of interest rules that apply to federal employees – whereas an appropriately narrow reading of the initial grant of jurisdiction minimizes that tension.

Moreover, Holmes has confronted these obstacles in an atmosphere necessarily hostile to jurisdiction, for we must presume that no jurisdiction exists, and we are obliged to strictly construe statutes conferring jurisdiction on the federal courts. The burden is on Holmes to prove that the district court had jurisdiction. She has not done so.

For these reasons, I respectfully dissent.

-24-